EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. José F. Aponte Hernández, en su capacidad de Representante y Presidente de la Cámara de Representantes de Puerto Rico; y la Cámara de Representantes de P.R. Parte Peticionaria en certificación v. Hon. Aníbal Acevedo Vilá, Gobernador, E.L.A. de P.R.; Hon. Juan Carlos Méndez, Secretario de Hacienda; Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto y el E.L.A. de P.R. Parte Recurrida<br><br>Ing. Nélida Santiago Rivera, en su capacidad oficial y en representación de la Superintendencia del Capitolio Parte Peticionaria en Certificación v. Hon. Aníbal Acevedo Vilá, Gobernador, E.L.A. de P.R.; Hon. Juan Carlos Méndez, Secretario de Hacienda; Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto y el E.L.A. de P.R. Parte Recurrida<br><br>Senado de Puerto Rico Demandante-Peticionario v. Hon. Aníbal Acevedo Vilá, Gobernador de Puerto Rico; Hon. Juan Carlos Méndez Torres, Secretario de Hacienda; Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto; y el E.L.A. de P.R. Parte Recurrida | Certificación<br><br>2006 TSPR 24<br><br>166 DPR \_\_\_\_ |

Número del Caso: CT-2005-6
          Cons. CT-2005-8

Fecha: 16 febrero de 2006

Abogados de la Parte Peticionaria:

                    Lcdo. Richard W. Markus
                    Lcdo. Manuel D. Herrero García
                    Lcdo. Jorge L. M. Cintrón Pabón
                    Lcdo. Rubén T. Nigaglioni Mignucci
                    Lcdo. Ángel J. Vargas Carcaña
                    Lcdo. Kevin Miguel Rivera-Medina

Tribunal de Apelaciones:

                    Región Judicial de San Juan Panel V

Panel integrado por su Presidente, el Juez Rivera Martínez y los Jueces González Rivera y Ramírez Nazario

Oficina del Procurador General:

Lcda. Sarah Y. Rosado Morales
Procuradora General Auxiliar

Lcdo. Salvador J. Antonetti Stutts
Procurador General

Materia: Interdicto Preliminar y Permanente; Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. José F. Aponte Hernández, | * | |
| en su capacidad de Representante | * | |
| y Presidente de la Cámara de | * | |
| Representantes de Puerto Rico; y | * | |
| la Cámara de Representantes de P.R. | * | |
|   Parte Peticionaria en certificación | * | CT-2005-06 |
|       v. | * | |
| Hon. Aníbal Acevedo Vilá, Gobernador, | * | |
| E.L.A. de P.R.; Hon. Juan Carlos Méndez, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | Certificación |
| y Presupuesto y el E.L.A. de P.R. | * | |
|   Parte Recurrida | * | |
| ------------------------------------------- | * | |
| Ing. Nélida Santiago Rivera, en su | * | |
| capacidad oficial y en representación de | * | |
| la Superintendencia del Capitolio | * | |
|   Parte Peticionaria en Certificación | * | |
|       v. | * | |
| Hon. Aníbal Acevedo Vilá, Gobernador, | * | Cons. |
| E.L.A. de P.R.; Hon. Juan Carlos Méndez, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | |
| y Presupuesto y el E.L.A. de P.R. | * | |
|   Parte Recurrida | * | |
| ******************************************* | | |
| Senado de Puerto Rico | * | |
|   Demandante-Peticionario | * | |
|       v. | * | |
| Hon. Aníbal Acevedo Vilá, | * | CT-2005-08 |
| Gobernador de Puerto Rico; | * | |
| Hon. Juan Carlos Méndez Torres, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | |
| y Presupuesto; y el E.L.A. de P.R. | * | Certificación |
| ******************************************* | | |

PER CURIAM

San Juan, Puerto Rico, a 16 de febrero de 2006.

Nos corresponde determinar si resulta oportuna nuestra intervención en este caso en el que la Asamblea Legislativa impugna ciertos ajustes a sus presupuestos, decretados originalmente por el Gobernador, pero que han sido revertidos por este último. Veamos.

I

El 30 de junio de 2005, la Asamblea Legislativa aprobó la Resolución Conjunta de la Cámara Núm. 445 que contenía el Presupuesto General de Gastos del Estado Libre Asociado de Puerto Rico proyectado para el año fiscal 2005-2006. Al día siguiente, esta pieza legislativa fue presentada al Gobernador para su evaluación correspondiente. Levantada la sesión legislativa, y pasado el término de 30 días sin que el Primer Ejecutivo tomara alguna acción respecto al proyecto, éste se entendió vetado en su totalidad según establece el Art. III, Sec. 19 de la Constitución del E.L.A., 1 L.P.R.A.

Ante este escenario, se activó el Art. VI, Sec. 6 de nuestra Constitución. En virtud de éste, las partidas consignadas en el Presupuesto General para el año fiscal 2004-2005, contenidas en la Resolución Conjunta Núm. 927 de 30 de junio de 2004,[1] continuaron rigiendo para el presente año económico en todo lo que fueran aplicables, siendo el Gobernador la persona facultada para autorizar los desembolsos necesarios.

Posteriormente, mediante la Orden Ejecutiva Núm. 58 de 30 de agosto de 2005, Boletín Administrativo Núm. OE 2005-58, el Hon. Aníbal Acevedo Vilá decretó ciertos ajustes a los desembolsos con cargo al Fondo General para el año económico 2005-2006, a base de las asignaciones consignadas en la R.C. 927. Según se expresó en la Orden, los referidos ajustes respondieron a que "[l]os recursos disponibles para el año fiscal 2005-2006 no basta[ban] para cubrir las

---

[1] En adelante R.C. 927.

asignaciones presupuestarias vigentes". Esto se debió a que estas asignaciones totalizaban $9.2 billones, mientras que los recursos estimados ascendían a $8.9 billones. Ante este escenario presupuestario particular y a los fines de asegurar el funcionamiento del gobierno durante el próximo año fiscal, el Primer Ejecutivo entendió que al autorizar los desembolsos necesarios conforme lo dispone la sección 6, Art. VI de nuestra Constitución, debía mantener un presupuesto balanceado, según lo ordena la sección 7 del Art. VI y, además, atender las prioridades establecidas por ley, a tenor con la sección 8 del mismo artículo. Es decir, el Gobernador activó las tres secciones constitucionales aludidas para ordenar los referidos ajustes presupuestarios. Además, se amparó en el poder conferido por la sección 2 de la R.C. 927[2] para transferir partidas entre diversos organismos. Junto con la Orden, el Gobernador incluyó una relación de los ajustes presupuestarios decretados, los cuales comprendieron el aumento de determinadas partidas y la reducción de otras.

Entre los ajustes decretados se encontraban los siguientes: (1) la reducción del presupuesto de la Cámara de Representantes a $41 millones, o sea, $6 millones menos que lo asignado para el mismo propósito mediante la R.C.

---

[2] La referida sección establece una regla que le da discreción al Primer Ejecutivo para realizar transferencias entre las asignaciones hechas en la Resolución Conjunta cuando los intereses del servicio y necesidades apremiantes de las agencias lo requieran, así como para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado.

927; (2) la reducción del presupuesto del Senado de $38 millones consignados en la R.C. 927 a $33.5 millones; y (3) la disminución de la partida correspondiente a las Actividades Conjuntas de la Asamblea Legislativa[3] a $10.78 millones, a pesar de que la R.C. 927 proveía $21.6 millones para el mismo concepto. Estos ajustes fueron certificados por la Directora de la Oficina de Gerencia y Presupuesto, Ing. Ileana Fas Pacheco.

A raíz de lo anterior, el Hon. José Aponte Hernández, por sí y en representación de la Cámara de Representantes, presentó una demanda sobre sentencia declaratoria e *injunction* contra el Gobernador, el Secretario de Hacienda y la Directora de la Oficina de Gerencia y Presupuesto. En esencia, adujo que el Gobernador, al ajustar unilateralmente las partidas presupuestarias aludidas, violó el Art. VI, Sec. 6 de nuestra Constitución y la doctrina de separación de poderes. Solicitó, por tanto, que se declarase inconstitucional la actuación del Primer Ejecutivo y que se ordenase a este último certificar como disponible para el año fiscal 2005-2006 un presupuesto idéntico al del año fiscal anterior, hasta tanto se aprobara un nuevo presupuesto.

Posteriormente, la Ing. Nélida Santiago Rivera, como Superintendente y en representación de la Superintendencia del Capitolio, presentó otra demanda contra los mismos demandados y bajo fundamentos sustancialmente similares. A

---

[3] De dicha partida se nutren los presupuestos de la Superintendencia del Capitolio y de la Oficina de Servicios Legislativos.

petición de ésta, el Tribunal de Primera Instancia consolidó ambos pleitos.

Tras varios trámites judiciales, y luego de la celebración de una vista argumentativa, el Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Carlos S. Dávila Vélez) dictó sentencia sumaria y declaró con lugar ambas demandas. Resolvió que el ajuste realizado por el Gobernador a las partidas presupuestarias era ilegal por violar la doctrina de separación de poderes y por constituir una concentración de poder indebida en la Rama Ejecutiva, la cual no surge expresamente de la Constitución. En vista de ello, emitió un auto de *injunction* permanente contra los funcionarios demandados para que cesaran y desistieran de reducir unilateralmente las referidas partidas presupuestarias.

Insatisfechos, el Gobernador y los demás demandados presentaron un recurso de apelación ante el Tribunal de Apelaciones. Antes de que el foro apelativo intermedio entrara a los méritos del caso, y al amparo del Art. 3.002(e) de la Ley de la Judicatura de 2003, 4 L.P.R.A. sec. 24s(e), y de la Regla 23 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A R. 23, la Cámara de Representantes y la Superintendencia del Capitolio acudieron ante nos mediante el presente recurso de certificación. Arguyeron, en síntesis, que la controversia presentada en este caso es una de gran interés público que amerita ser resuelta finalmente por este Tribunal. En vista de ello y de que el Gobernador y demás

demandados solicitaron, a su vez, nuestra intervención, expedimos el auto de certificación. (Caso Núm. CT-2005-6)

Mientras tanto, el Senado de Puerto Rico, representado por su Presidente, Hon. Kenneth McClintock Hernández, había presentado otra demanda ante el tribunal de instancia sobre sentencia declaratoria e *injunction* contra los mismos demandados.[4] Su argumento fue básicamente el mismo de la Cámara de Representantes. Además, alegó la inconstitucionalidad de la Ley Orgánica de la Oficina de Gerencia y Presupuesto, Ley Núm. 147 de 18 de junio de 1980, en la medida que ésta delegaba al Gobernador la facultad para establecer prioridades en el desembolso de fondos públicos sin parámetros o guías. Solicitó, por tanto, que se declarase ilegal la actuación del Primer Ejecutivo de reducir, aumentar y transferir partidas del presupuesto general, así como la disminución del presupuesto del Senado y de la Oficina de Servicios Legislativos.

Luego de ciertos trámites procesales, otra sala del Tribunal de Primera Instancia (Hon. Oscar Dávila Suliveres) dictó sentencia sumaria a favor del Gobernador y demás funcionarios demandados. Concluyó que, ante un déficit presupuestario, el Primer Ejecutivo no podía autorizar el

---

[4] Dicha demanda fue presentada luego de que el Senado acudiera al Tribunal de Distrito Federal de Puerto Rico con los mismos reclamos y el referido foro se declarara sin jurisdicción sobre la materia. *Senate v. Hon. Aníbal Acevedo Vilá*, Civil no. 05-2082(JAF). El caso iniciado ante el Tribunal de Primera Instancia fue referido a una sala distinta a la que atendió y resolvió la demanda presentada por la Cámara de Representantes y la Superintendencia del Capitolio.

desembolso de todos los gastos para el funcionamiento del gobierno, y venía obligado a procurar que el presupuesto general estuviese balanceado y a atender los intereses del servicio y las necesidades apremiantes del País, según disponen las secciones 6, 7 y 8 del Art. VI de nuestra Constitución y la sección 2 de la R.C. 927. En vista de lo anterior, razonó que el Gobernador podía ajustar las asignaciones presupuestarias del Senado sin que ello vulnerara la doctrina de separación de poderes.

Inconforme, el Senado acudió ante nos mediante un recurso de certificación. Acordamos expedir. (Caso Núm. CT-2005-8) A solicitud del Gobernador, y por presentar este recurso cuestiones similares de hecho y de derecho a las planteadas por la Cámara de Representantes en el suyo, ordenamos la consolidación de ambos casos. El Presidente de la Cámara de Representantes y el Gobernador presentaron sus respectivos alegatos.

Así las cosas, el 19 de diciembre de 2005, el Gobernador presentó ante nosotros una Moción de Desistimiento y en Solicitud de Desestimación. Informó a este Tribunal que mediante la Orden Ejecutiva promulgada el 16 de diciembre de 2005, Boletín Administrativo Núm. OE-2005-78, había dispuesto el desembolso total de las asignaciones presupuestarias de la Rama Legislativa. Por tanto, desistía del recurso presentado contra la Cámara de Representantes y solicitaba la desestimación del recurso presentado por el Senado por ser éste académico. En atención a lo anterior, concedimos término a las cámaras

legislativas para que expresaran sus posiciones. Éstas han comparecido en oposición a la solicitud del Gobernador.[5]

Resolvemos con el beneficio de las posiciones de las partes.

## II

Los cambios fácticos que han acontecido desde el inicio de esta controversia nos imponen el deber de determinar, en primera instancia, si los hechos actuales son los propicios para nuestro pronunciamiento. Esto, en atención al argumento del Gobernador de que los cambios han tornado la controversia en una académica.

La doctrina de justiciabilidad imprime a nuestro ordenamiento jurídico ciertas limitaciones al ejercicio del poder judicial con el fin de que los tribunales puedan precisar el momento oportuno para su intervención. Hemos resuelto que un caso no es justiciable cuando las partes no tienen legitimación activa, cuando el caso no está maduro, cuando se presenta una cuestión política o cuando la controversia se ha tornado académica. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).

Una controversia es académica, y por tanto no apta para la intervención judicial, cuando los hechos o el derecho aplicable han variado de tal forma que ya no existe

---

[5] El 21 de diciembre de 2005, el Senado presentó su oposición a la moción de desestimación. Por su parte, la Cámara de Representantes presentó su oposición al desistimiento el 27 de diciembre de 2005. Ambos escritos fueron replicados por el Gobernador mediante moción presentada el 11 de enero de 2006. El 20 de enero de 2006, el Senado presentó una dúplica a la réplica presentada por el Gobernador.

una controversia actual entre partes adversas. *PNP v. Carrasquillo*, res. el 27 de octubre de 2005, 2005 TSPR 157. Este precepto legal exige que exista una controversia real en todas las etapas del proceso judicial, tanto la inicial como la apelativa. *Véase Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990); E. Chemerinsky, *Constitutional Law Principles and Policies,* 2da ed., New York, Aspen Publisher, 2002, sec. 2.7.1, pág. 112. Su análisis requiere la evaluación de los eventos anteriores, próximos y futuros, para determinar si su condición de controversia viva y presente subsiste con el transcurso del tiempo. *San Antonio Maritime v. P.R. Cement Co.*, 153 D.P.R. 374 (2001).

Esta normativa persigue el propósito de evitar decisiones judiciales que acarreen pérdida de tiempo, conflicto con otras ramas del gobierno o que puedan estar diseñadas sin el beneficio de argumentos propios de partes adversas. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto* Rico, Colegio de Abogados, 1986, Vol. I, pág. 122. Intenta impedir, además, el uso innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos. *Emp. Pur. Des., Inc. v. H.I.E.Tel.*, 150 D.P.R. 924 (2000); *C.E.E. v. Depto de Estado*, 134 D.P.R. 927 (1993).

No obstante lo anterior, se reconocen varias excepciones a esta doctrina. Por ejemplo, cuando se plantean cuestiones recurrentes capaces de evadir revisión judicial; cuando la situación de hechos ha sido modificada

por el demandado, pero no tiene características de permanencia; o cuando persisten consecuencias colaterales de una controversia que se ha tornado académica. *Angueira v. J.L.B.P.*, 150 D.P.R. 10 (2000). *Véase además* L.H. Tribe, *American Constitutional Law*, 3ra ed., New York, Foundation Press, 2000, Vol. I, págs. 347-361.

En consideración a este trasfondo legal, evaluemos si debemos entrar a los méritos del caso de epígrafe.

III

El Hon. Aníbal Acevedo Vilá, mediante Orden Ejecutiva promulgada el 16 de diciembre de 2005, Boletín Administrativo OE-2005-78, ha repuesto la cantidad de dinero que originalmente redujo a los presupuestos de la Asamblea Legislativa. Esto, debido a que los recaudos del Gobierno han sobrepasado las proyecciones de ingresos estimados para este año fiscal. Según informó el Primer Ejecutivo, dicho aumento en los ingresos se debió a la creciente actividad económica y a las medidas implementadas sobre fiscalización gubernamental.

Consideró, además, importante el hecho de que:

Para las agencias calificadoras del crédito de Puerto Rico, es imprescindible que las dos ramas políticas del gobierno trabajen en espíritu de colaboración, y que se demuestre un genuino ambiente de diálogo. Este ajuste que por la presente se realiza debe propender a una mejor y más estrecha colaboración entre las referidas ramas gubernamentales, reduciendo así significativamente la preocupación que a esos efectos tienen las referidas agencias calificadoras. Orden Ejecutiva, OE-2005-78, pág. 1.

Con la promulgación de la orden ejecutiva aludida, el Gobernador revirtió los efectos de su Orden Ejecutiva Núm. 58 de 30 de agosto de 2005, la cual desembocó en el pleito judicial del epígrafe.

Según se desprende de lo anterior, ya la Asamblea Legislativa no requiere nuestra intervención para procurar la reposición de sus presupuestos. Además, parece evidente que la condición fiscal del país no es la misma que existía cuando el Gobernador decidió reducir los aludidos presupuestos. Es decir, la controversia que llegó ante nosotros ya no es un obstáculo legal ni práctico para el normal desenvolvimiento de ambas ramas políticas de nuestro gobierno.

De otra parte, debido a las particularidades de la controversia que se nos presentó, entendemos que no existe una probabilidad razonable de que la misma vuelva a repetirse. Es decir, su recurrencia requeriría que existiera un tranque en el proceso de formulación y aprobación del presupuesto, en circunstancias de crisis fiscal, y que el Primer Mandatario vuelva a reducir unilateralmente los presupuestos de otra rama del gobierno. En el pasado siglo, nunca se nos presentó un trasfondo fáctico análogo. Resulta, pues, muy especulativo concluir que una controversia idéntica a ésta volverá a suscitarse.

Por otro lado, no podríamos concluir que esta controversia volverá a repetirse sin antes aventurarnos a predecir que el debate constitucional entre las ramas políticas del gobierno, en el futuro, no será uno

productivo. Con ello le estaríamos restando legitimidad y productividad a nuestro sistema político constitucional en los años por venir, sin tan siquiera darle una oportunidad de desarrollarse y consolidarse, y sin contar con los elementos para emitir ese juicio.

Aún asumiendo que el ambiente político y económico de Puerto Rico es uno propicio para que la controversia surja nuevamente, resulta igualmente especulativo resolver que dicho asunto pueda evadir la revisión judicial. Esta controversia no era una que, inherentemente, producía efectos de corta duración. El presupuesto para gastos generales del Gobierno se formula y aprueba para el año fiscal y no para su primer mes, por lo que sus consecuencias se extienden por un año. *Cf. Emp. Pur. Des., Inc. v. H.I.E.Tel., supra.*[6]

Además, nuestro ordenamiento jurídico cuenta con el mecanismo adecuado para revisar este tipo de controversia con mayor agilidad. El Art. 3.002(e) de la Ley de la Judicatura de 2003, 4 L.P.R.A. sec. 24s(e), establece que este Tribunal:

> Mediante auto de certificación, a ser expedido discrecionalmente, *motu proprio*, o a solicitud de parte, podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de

[6] No podemos equiparar la duración de los efectos que produce un presupuesto formulado anualmente con la que inherentemente producen las manifestaciones públicas o los actos de protesta, los cuales, con mayor probabilidad, cesan antes de que culmine el proceso judicial iniciado con relación a éstos.

derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de Estados Unidos.

El mecanismo de certificación cumple el propósito de adelantar el trámite judicial ordinario con el objetivo de que este Tribunal pueda atender cuestiones que por su gran importancia y envergadura ameritan ser resueltas prontamente. *Rivera Soto v. Junta de Calidad Ambiental*, res. el 3 de marzo de 2005, 2005 TSPR 18; *Suárez Jiménez v. C.E.E.*, res. el 20 de noviembre de 2004, 2004 TSPR 179. Nótese que sólo basta con que el caso esté pendiente ante el tribunal de instancia para que se nos pueda presentar la controversia mediante este recurso. Incluso, *motu proprio*, podemos traer inmediatamente la controversia ante nosotros para considerarla y resolverla. En fin, la existencia del recurso de certificación elimina prácticamente la posibilidad de que este tipo de casos evada nuestro pronunciamiento sobre el asunto.

Por otra parte, entendemos que no aplica la excepción a la doctrina de academicidad basada en que los cambios fácticos fueron producidos por el demandado sin visos de permanencia. El cambio en la situación fiscal del Gobierno permitió al Gobernador identificar los recursos disponibles y ordenar la devolución de los fondos a la Rama Legislativa. La Oficina de Gerencia y Presupuesto ya ha comenzado a cumplir esta norma, según surge de la misiva de la Ing. Ileana Fas Pacheco dirigida al Gobernador con fecha

de 11 de enero de 2006. Es decir, los fondos están siendo transferidos a la Asamblea Legislativa.

Igualmente, dicha partida pronto perderá su vigencia debido a que el año fiscal concluirá en cinco meses. Usualmente es en esta etapa del año fiscal que la Rama Ejecutiva tiene un cuadro más completo sobre los ingresos que se proyectan para el año, pues han transcurrido siete meses desde el inicio del mismo. Estas circunstancias abonan a la conclusión de que la reposición de los presupuestos de la Rama Legislativa no será revertida, aun cuando decidamos no intervenir en el caso.

Por último, pesa sobre nuestro análisis el hecho de que la ocasión no es la propicia para un pronunciamiento nuestro. Debemos reconocer que existe un proceso político entre las Ramas aquí protagonistas que no se ha paralizado y cuyos frutos dependerán en gran parte de que éstas armonicen sus diferencias sin nuestra intervención, en la medida que no exista una controversia justiciable entre ellos. La situación gubernamental actual amerita que estas Ramas trabajen en conjunto para resolver asuntos de mayor trascendencia e importancia para el bienestar del pueblo de Puerto Rico. El proceso político debe continuar su cauce. En ausencia de circunstancias que ameriten la intervención judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo en la encomienda que los electores le han delegado para los años restantes de este cuatrienio. Todas estas consideraciones

ameritan   nuestra   prudencia   y   abstención   en   estas circunstancias no aptas para la intervención judicial.

En vista de todo lo anterior, nos abstenemos de pronunciarnos   sobre   la   controversia   que   originalmente presentaban los casos aquí consolidados.

IV

Por los fundamentos que preceden, se anulan los autos expedidos en los casos *Hon. José Aponte Hernández v. Hon. Aníbal Acevedo Vilá y otros*, CT-2005-06, y *Senado de Puerto Rico v. Hon. Aníbal Acevedo Vilá y otros*, CT-2005-08 y se ordena el archivo de los mismos.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. José F. Aponte Hernández, | * | |
| en su capacidad de Representante | * | |
| y Presidente de la Cámara de | * | |
| Representantes de Puerto Rico; y | * | |
| la Cámara de Representantes de P.R. | * | |
|    Parte Peticionaria en certificación | * | CT-2005-06 |
|       v. | * | |
| Hon. Aníbal Acevedo Vilá, Gobernador, | * | |
| E.L.A. de P.R.; Hon. Juan Carlos Méndez, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | Certificación |
| y Presupuesto y el E.L.A. de P.R. | * | |
|    Parte Recurrida | * | |
| ------------------------------------------- | * | |
| Ing. Nélida Santiago Rivera, en su | * | |
| capacidad oficial y en representación de | * | |
| la Superintendencia del Capitolio | * | |
|    Parte Peticionaria en Certificación | * | |
|        v. | * | |
| Hon. Aníbal Acevedo Vilá, Gobernador, | * | Cons. |
| E.L.A. de P.R.; Hon. Juan Carlos Méndez, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | |
| y Presupuesto y el E.L.A. de P.R. | * | |
|    Parte Recurrida | * | |
| ******************************************** | | |
| Senado de Puerto Rico | * | |
|    Demandante-Peticionario | * | |
|        v. | * | |
| Hon. Aníbal Acevedo Vilá, | * | CT-2005-08 |
| Gobernador de Puerto Rico; | * | |
| Hon. Juan Carlos Méndez Torres, | * | |
| Secretario de Hacienda; Ing. Ileana Fas | * | |
| Pacheco, Directora, Oficina de Gerencia | * | |
| y Presupuesto; y el E.L.A. de P.R. | * | Certificación |
| ******************************************** | | |

SENTENCIA

San Juan, Puerto Rico, a 16 de febrero de 2006.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se anulan los autos expedidos en los casos *Hon. José Aponte Hernández v. Hon. Aníbal Acevedo Vilá y otros*, CT-2005-06, y *Senado de Puerto Rico v. Hon. Aníbal Acevedo Vilá y otros*, CT-2005-08 y se ordena el archivo de los mismos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor

Fuster Berlingeri emitió Opinión Concurrente. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión Disidente. El Juez Asociado señor Rivera Pérez disiente sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. José F. Aponte Hernández, Et Al. | * * |
|     Parte Peticionaria en Certificación | * * |
|         vs. | *    CT-2005-006 |
| Hon. Aníbal Acevedo Vilá, Gobernador, Et Al. | *    Certificación * |
|     Parte Recurrida | * |

-----------------------------------------*

| | |
|---|---|
| Ing. Nélida Santiago Rivera, Et Al. | * |
|     Parte Peticionaria en Certificación | * * |
|         vs. | *    Cons. |
| Hon. Aníbal Acevedo Vilá, Gobernador, Et Al. | * * |
|     Parte Recurrida | * |

* * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| Senado de Puerto Rico | * |
|     Demandante-Peticionario | * |
|         vs. | *    CT-2005-008 |
| Hon. Aníbal Acevedo Vilá, Gobernador, Et Al. | *    Certificación * |
|     Demandados-Recurridos | * |

* * * * * * * * * * * * * * * * * * * * *

Opinión Concurrente emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 16 de febrero de 2006.

Es innegable que el caso de autos gira en torno a una cuestión primordial de gran trascendencia. Dicha cuestión no sólo constituyó recientemente la médula de una grave disputa entre el Gobernador de Puerto Rico y la mayoría de la Rama Legislativa, sino que tiene una importancia que va más allá de las realidades y circunstancias del caso de autos.

La cuestión referida es la siguiente: en la situación excepcional de que entre las ramas políticas se haya llegado a un **impase** sobre el presupuesto del próximo año, **¿qué sucede si las asignaciones dispuestas en el presupuesto anterior exceden los recursos totales calculados para el nuevo año económico**? La Sección 6 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico claramente dispone que cuando no se logre aprobar el presupuesto para un año económico, regirá para ese año el presupuesto del año anterior, pero **¿qué pasa si los fondos que se contemplan para ese nuevo año no son suficientes para sufragar otra vez los mismos gastos realizados durante el año anterior**?

La Constitución tiene otras dos cláusulas que tratan específicamente con este asunto del presupuesto. Una de ellas prohíbe que las asignaciones presupuestarias excedan los recursos anticipados; la otra establece **un orden de prioridades** precisamente para el caso en que las asignaciones presupuestarias excedan el cálculo de los recursos disponibles. Resulta, sin embargo, que estas dos disposiciones se refieren textualmente al presupuesto **de un mismo año**. Los términos de dichas dos cláusulas aluden a las partidas y asignaciones de un solo año económico y, **al menos literalmente**, no se refieren a los desembolsos a realizarse durante un año económico a base de lo dispuesto en el presupuesto del año anterior. De su faz, no se ocupan directamente de la cuestión suscitada por el caso de autos, formulada en el párrafo previo de este escrito.

Por lo anterior, la cuestión referida es una que no tiene una solución indisputable provista concretamente en el texto de la Constitución del país. **Dicha cuestión primordial aparentemente no fue anticipada específicamente por los que redactaron nuestra ley fundamental**. Por ello, le corresponde a este Foro buscarle **oportunamente** una respuesta mediante un análisis del historial de la Constitución que nos permita derivar las implicaciones normativas pertinentes del esquema jurídico que sí se plasmó en esa magna carta sobre el asunto del presupuesto y sobre el asunto de los respectivos poderes gubernamentales de las ramas políticas. Como en tantas otras ocasiones, pues, en su momento nos tocaría **interpretar** la Constitución del Estado Libre Asociado de Puerto Rico, para resolver la cuestión de fondo planteada en el caso de autos.

Ahora bien, importantes razones de orden público aconsejan que nos abstengamos de resolver **ahora** la cuestión referida. Hacerlo en este caso en este momento constituiría sin dudas un pronunciamiento de índole consultivo debido a que la disputa concreta que propició el caso de autos **ya no existe**. Estando próximos a decidir, el Gobernador nos ha informado que ha dejado sin efecto los ajustes que había decretado con respecto a las asignaciones presupuestarias de la Asamblea Legislativa, que habían dado lugar a la disputa en cuestión.

Como se sabe, este Foro no emite **opiniones consultivas**. Desde hace mucho tiempo está claramente establecido en nuestro ordenamiento jurídico que nuestra

función de dilucidar con finalidad el orden constitucional del país sólo debe hacerse dentro de los límites de una controversia viva entre litigantes opuestos, de modo tal que nuestra decisión en tal controversia tenga un impacto real y afecte las relaciones jurídicas de los litigantes en disputa. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).

Es por lo anterior que estamos impedidos de resolver ahora la importante cuestión constitucional identificada antes. Concurro, pues, con lo resuelto en la opinión Per Curiam emitida aquí.


                                        JAIME B. FUSTER BERLINGERI
                                                  JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. José F. Aponte Hernández, en su capacidad de Representante y Presidente de la Cámara de Representantes de Puerto Rico; y la Cámara de Representantes de Puerto Rico<br><br>    Parte Peticionaria en Certificación<br>            v.<br>Hon. Aníbal Acevedo Vilá, Gobernador, Estado Libre Asociado de Puerto Rico; Hon. Juan. Carlos Méndez, Secretario de Hacienda; Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto y el Estado Libre Asociado de Puerto Rico<br>    Parte Recurrida | CT-2005-06<br><br><br><br>Certificación |
| Ing. Nélida Santiago Rivera, en su Capacidad oficial y en representación de la Superintendencia del Capitolio<br>    Parte Peticionaria en Certificación<br>            v.<br>Hon. Aníbal Acevedo Vilá, Gobernador, Estado Libre Asociado de Puerto Rico; Hon. Juan. Carlos Méndez, Secretario de Hacienda; Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto y el Estado Libre Asociado de Puerto Rico<br>    Parte Recurrida | cons |
| Senado de Puerto Rico<br>    Demandante-Peticionario<br>            v.<br>Hon. Aníbal Acevedo Vilá, Gobernador de Puerto Rico; Hon. Juan Carlos Méndez Torres, Secretario de Hacienda;  Ing. Ileana Fas Pacheco, Directora, Oficina de Gerencia y Presupuesto; y el E.L.A. de P.R.<br>    Parte Recurrida | CT-2005-08<br><br><br><br>Certificación |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico, a 16 de febrero de 2006

Disiento de la determinación que toma una Mayoría de este Tribunal declarando que los casos de epígrafe se han tornado académico ante la actuación unilateral de la parte

demandada recurrida de cesar la conducta que dio base a este litigio originalmente, al restaurarle al presupuesto de los peticionarios los dineros recortados. Mi disconformidad se asienta sobre la ausencia de garantía de que la parte demandada recurrida no habrá de incurrir en la misma conducta en el futuro, cuando se hayan de confeccionar nuevos presupuestos durante este cuatrienio. Siendo ello así, estimo que este caso se encuentra entre las excepciones a la doctrina de academicidad que en el pasado hemos reconocido, aunque no habíamos tenido ocasión de aplicar.

Es norma trillada que un caso se torna académico cuando su condición de controversia viva y presente cesa por el transcurso del tiempo. *Emp. Pub. Des., Inc. v. H.I.E. T.E.L.*, 150 D.P.R. 924 (2000); *PPD v. Gobernador I*, 139 D.P.R. 643 (1995). De ahí que, en alguna medida, la doctrina de academicidad no es otra cosa que la doctrina de acción legitimada en el tiempo. Monogham, Constitutional Adjudication: The Who and When, 82 *Yale L. J.* 1363, 1384 (1974). Véase también, *P.N.P. v. Carrasquillo*, res. 27 de octubre de 2005, 165 D.P.R. ___, 2005 TSPR 157.

Hemos resuelto sin embargo, que esta doctrina tiene varias excepciones, a saber: primero, cuando se plantea una cuestión recurrente; segundo, cuando la cuestión de hechos ha sido modificada por el demandado, pero no tiene características de permanencia; o, tercero, en situaciones donde persistan consecuencias colaterales que no se han tornado académicas. *Cruz Negrón v. Adm. De Corrección*, res.

28 de marzo de 2005, 163 D.P.R. ___, 2005 TSPR 34; *Angueira v. J.L.B.P.*, 150 D.P.R. 10 (2000).

La controversia ante nuestra consideración, a mi juicio, ubica en la segunda de las excepciones. Bajo la misma, un caso no es académico cuando el demandado cesa su alegada actuación ilegal o impropia, sin que existan garantías que en el futuro no habrá de incurrir en la conducta impugnada. La referida excepción no ha sido aplicada anteriormente por este Tribunal. Véase, *Comisión de Asuntos de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 728 (1980); *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 720 (1991). La misma, sin embargo, sí ha sido utilizada ampliamente por el Tribunal Supremo de los Estados Unidos, por lo que es apropiado repasar las expresiones de dicho foro sobre este asunto.

Esta excepción se conoce en la doctrina norteamericana como "la excepción de cese voluntario." En el caso seminal *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953), el Tribunal Supremo de los Estados Unidos describió la misma de la siguiente manera:

> Both sides agree to the abstract proposition that **voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot** . . . A controversy may remain to be settled in such circumstances [. . .] The defendant is free to return to his old ways. **This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.** (Citas omitidas.) (Énfasis nuestro.)

En igual sentido, *City of Mesquite v. Aladdin´s Castle*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant´s voluntary cessation of a challenged practice does not deprive

a federal court of its power to determine the legality of the practice."); *Friends of Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000); *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Allee v. Medrano*, 416 U.S. 802, 810-11 (1974); *DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974). Véase además, L. Tribe, *American Constitutional Law*, Foundation Press, 3rd ed., Vol. 1, 2000, sec. 3.11, págs. 353-356; E. Chemerinsky, *Constitucional Law, Principles and Policies*, Aspen Publishers, 2d ed., 2002, sec. 2.7.4.

Esta excepción se asienta sobre el principio que el demandado que ha incurrido en una actuación alegadamente ilegal, no debe evadir la revisión judicial meramente porque cesa su conducta, si no existen verdaderas garantías de que la conducta impugnada no se habrá de repetir en lo sucesivo. Ello así porque de concluirse que un litigio se torna académico y se desestima el mismo, el demandado queda liberado de un dictamen judicial y puede así incurrir nuevamente en la conducta proscrita. En *Comisión de Asuntos de la Mujer, supra*, pág. 728, indicamos "que un caso no se torna ilusorio por conducta voluntaria de un demandado, quien luego puede 'retomar a sus viejos caminos.'" Así también, en *Gwaltney of Smithfield, Ltd. V. Chesapeake Bay Foundation, Inc*, 484 U.S. 49, 66-67, se indicó: "Mootness doctrine . . . protects plaintiffs from defendants who seek to evade sanction by predicable 'protestations of repentance and reform.'"

Los hechos en este caso encuentran fácil acomodo en la excepción antes mencionada. El 19 de diciembre de 2005, la parte demandada recurrida presentó ante nuestra consideración una escueta moción donde informó que el señor Gobernador había emitido una orden ejecutiva "en la que dispuso para el desembolso total de las asignaciones presupuestarias de la Rama Legislativa." En vista de ello, informó que desistía del pleito CT-2005-006, en el cual había solicitado ante el Tribunal de Apelaciones la revocación de la sentencia dictada por el Tribunal de Primera Instancia, en el caso Aponte Hernández v. Acevedo Vilá, KPE-2005-3411, consolidado con el caso Santiago Rivera v. Acevedo Vilá, KPE-2005-3450. Además, solicitó la desestimación del caso Senado de Puerto Rico v. Acevedo Vilá, CT-2005-008, por académico.[7] La moción presentada no solicitó el *vacatur* de las sentencias emitidas por los foros primarios. Tanto la Cámara de Representantes como el Senado de Puerto Rico se opusieron a la petición del Gobernador.[8]

Nada hay en la moción presentada que nos permita concluir, con algún grado de certeza, que en lo sucesivo el Gobernador no habrá de incurrir en la misma práctica. Tan es así, que sobre este asunto la moción guardó silencio. Es decir, el Gobernador no ha expresado si al confeccionar los

---

[7] Para efectos de la posición expresada en esta Opinión disidente, es inconsecuente que el mecanismo procesal invocado por la parte recurrida sea la desestimación por desistimiento en un caso, y la desestimación por academicidad en el otro. Véase discusión, *infra*.

[8] La parte recurrida replicó a dichas mociones y en el escrito presentado sólo se discutió la excepción de recurrencia de la doctrina de academicidad.

presupuestos para los próximos años fiscales, se abstendrá de reducir unilateralmente el presupuesto de la Rama Legislativa. Ésta es precisamente la controversia medular en este caso y la que incide directamente sobre la doctrina de separación de poderes. Soy del criterio que sin este tipo de certeza o demostración, un caso no se torna académico. Le compete al demandado el peso de demostrar que en el futuro no incurrirá en la práctica o conducta impugnada, lo que no ha ocurrido en el caso ante nuestra consideración. En *Friends of the Earth, Inc. v. Laidlaw, supra,* págs. 189-190, el Tribunal Supremo por voz de la Juez Asociada Ginsburg, indicó lo siguiente:

> [T]he standard we have announced for determining whether a case has been mooted by the defendant´s voluntary conduct **is stringent**: 'A case might become moot if subsequent events made it **absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'  The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start upon again lies with the party asserting mootness**. . . [A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that **it is absolutely clear** the allegedly wrongful behavior could not reasonably be expected to recur. (Citas omitidas.)  (Énfasis nuestro.)

En igual sentido, *United States v. Concentrated Phosphate Export Ass.*, 393 U.S. 199, 203 (1968).

En ausencia de tal demostración, debo concluir como cuestión de derecho, que no procede acceder a la petición del señor Gobernador. Soy consciente, que en el caso instado por la Cámara de Representantes pesa contra los demandados una orden de injuction que les impide, en lo sucesivo, incurrir

en la misma conducta. Recordemos, como ya se indicó, que el Gobernador no solicitó el *vacatur* de la sentencia dictada por el Tribunal de Primera Instancia, por lo que la orden de injuction permanece vigente. En vista de ello, uno de los criterios para invocar la excepción de "cese voluntario" de la doctrina de academicidad no está presente en ese caso. Entiendo sin embargo que ello no es óbice para denegar el desistimiento solicitado por el Gobernador en el caso instado por la Cámara de Representantes. Me explico.

Al adjudicar si los hechos de este caso conforman la excepción a la doctrina de academicidad que hemos discutido, **es necesario también ponderar la naturaleza de la controversia planteada y el interés público que la misma se resuelva concluyentemente**. *W.T. Grant Co., supra*. Ello abona a despejar toda sombra sobre la corrección de la actuación del Gobernador. La disputa ante nuestra consideración por lo tanto, es una de gran trascendencia que incide directamente sobre la doctrina de separación de poderes y las facultades y prerrogativas de la Rama Ejecutiva y la Rama Legislativa respecto el proceso de confección y aprobación del presupuesto del país. Cuando se invoca el "gobierno compartido", la necesidad de aclarar hasta dónde llegan los poderes de cada una de las ramas en este proceso es asunto de alto interés público. En la medida que se aclaran los linderos de esas facultades, el impulso a rebasar los mismos se minimiza y se evitan conflictos entre las ramas del gobierno. Ello, ciertamente, redunda en beneficio para el país.

Adviértase además, que al acceder a la solicitud del Gobernador, habrán de subsistir dos decisiones diametralmente distintas sobre un asunto de alto interés público y de vital importancia para el adecuado balance entre dos ramas de poderes de nuestro gobierno. Es función de este Tribunal impartirle contenido a la Constitución del Estado Libre Asociado, además de actuar como árbitro imparcial en las disputas naturales que se suscitan entre el Poder Ejecutivo y el Poder Legislativo. Al desestimar los recursos pendientes ante nuestra consideración, a mi juicio, poco abonamos a cumplir con ese deber constitucional.

Por las razones antes expresadas disiento de la decisión que hoy toma una Mayoría de este Tribunal.

Habida cuenta que soy del criterio que nada impide que atendamos los reclamos traídos ante nuestra atención, paso a discutir los contornos de la controversia que pende ante nuestra consideración.

El caso ante nosotros nos permite, por primera vez, impartirle contenido al conjunto de disposiciones constitucionales encaminadas a reglamentar los procedimientos presupuestarios y fiscales del Estado Libre Asociado de Puerto Rico. Ello, en el contexto de la más reciente controversia entre dos ramas del gobierno, la Rama Ejecutiva y la Rama Legislativa.

Específicamente, debemos determinar si el Gobernador del Estado Libre Asociado de Puerto Rico tiene autoridad constitucional o estatutaria para, activado el Art. VI, Sec. 6 de la Constitución del Estado Libre Asociado, reducir

unilateralmente el presupuesto correspondiente a la Cámara de Representantes y a la Superintendencia del Capitolio.

I

El 16 de marzo de 2005, el Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá, presentó ante la Asamblea Legislativa su Informe Anual sobre la situación de estado del país. Posteriormente y conforme al mandato constitucional, presentó ante la Cámara de Representantes un proyecto de resolución conjunta recomendando las partidas para el presupuesto fiscal del año 2005-2006. Esta resolución se convirtió en la Resolución Conjunta de la Cámara Número 445 ("R.C. de la C. 445").

Luego de los trámites de rigor, la Cámara de Representantes aprobó la R.C. de la C. 445 y remitió la misma al Senado de Puerto Rico para su aprobación. El Senado la aprobó con enmiendas por lo que el proyecto fue referido a comité de conferencia. El 30 de junio de 2005 quedó aprobada la referida resolución. Una vez fue enrolada y firmada, la misma fue remitida al Gobernador para su firma o veto.

Recibida por el Gobernador, éste le impartió un veto de bolsillo. En ese momento y de conformidad con el Art. VI, Sec. 6 de la Constitución del Estado Libre Asociado, automáticamente permanecieron vigentes las partidas consignadas para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública que se aprobaron para el año económico 2004-2005. Es decir, se auto renovaron las partidas contenidas en la Resolución Conjunta de la Cámara Número 927 ("R.C. de la

C. 927"), aprobada el 30 de junio de 2004, que contiene la mayoría de las asignaciones de gastos, así como cualquier otra ley que incluyera alguna asignación para gastos del funcionamiento de gobierno.

El presupuesto general de la Cámara de Representantes para el año económico 2004-2005, conforme dispuesto en la R.C. de la C. 927, fue de cuarenta y ocho millones trescientos ochenta y cuatro mil dólares ($48,384,000.00). De éstos, cuarenta y siete millones ($47,000,000.00) correspondieron a la R.C. de la C. 927 y el remanente a la Ley Núm. 168 del 12 de julio de 2004, que otorgó aumentos salariales a los empleados públicos. Por otro lado, el presupuesto del Senado para el año económico 2004-2005 fue de treinta y ocho millones de dólares ($38,000,000.00).

Evaluadas las asignaciones totales de gastos ordinarios de funcionamiento del gobierno aprobadas durante el año fiscal 2004-2005[9], la Rama Ejecutiva ha estimado que éstas ascendieron a nueve mil millones doscientos ochenta y cuatro millones de dólares ($9,284,000,000.00). El Secretario de Hacienda, por su parte, ha estimado que los recursos totales calculados para el año económico 2005-2006 serán de ocho mil millones novecientos cuarenta y cinco millones dólares ($8,945,000,000.00). A la luz de lo anterior, el Ejecutivo

---

[9] Utilizamos indistintamente año económico o año fiscal, aunque la Constitución del Estado Libre Asociado de Puerto Rico se refiere exclusivamente a año económico.

concluyó que el presupuesto de gastos para el año 2005-2006 es uno deficitario.[10]

Al no aprobarse un presupuesto para el año económico 2004-2005, el Gobernador invocó la facultad que le otorga el Art. VI, Sec. 6 de la Constitución, para promulgar la Orden Ejecutiva Núm. 58 de 30 de agosto de 2005, Boletín administrativo Núm. 2005-58 ("Orden Ejecutiva"). Toda vez que los recursos totales calculados son insuficientes para cubrir las asignaciones hechas, el Gobernador realizó aquellos ajustes que estimó necesarios a las partidas de fondos autorizados mediante asignaciones para el año económico 2004-2005, para conformar las mismas a los recursos totales calculados para el año económico 2005-2006.

Entre las partidas ajustadas se incluyó la correspondiente a la Cámara de Representantes, la cual sufrió una reducción de siete millones trescientos ochenta y cuatro mil trescientos ochenta dólares ($7,384,380.00). Se reajustó también la partida correspondiente a "Actividades Conjuntas" de la cual se nutre la Superintendencia del Capitolio. Esta partida sufrió una reducción de diez millones setecientos ochenta mil dólares. ($10,780,000.00); de los cuales, poco más de cinco millones corresponden a la Superintendencia del Capitolio. Finalmente, la partida correspondiente al Senado

---

[10] La parte demandante no ha cuestionado la fórmula y el cálculo utilizado por el Primer Ejecutivo para determinar qué partidas se auto renovaron por operación del Art. VI, Sec. 6 de la Constitución del Estado Libre Asociado de Puerto Rico y, a cuánto asciende el presupuesto del país. Por lo que este asunto no está propiamente ante nuestra consideración. Ateniéndonos a las sabias normas prudenciales de autolimitación judicial no nos expresamos sobre el particular. *E.L.A. v. Aguayo*, 80 D.P.R. 554 (1958).

de Puerto Rico sufrió una reducción de cuatro millones quinientos mil dólares ($4,500,000.00).

Así las cosas, el 23 de septiembre de 2005, el Presidente de la Cámara de Representantes, Hon. José Aponte Hernández, en su capacidad de Representante y Presidente del cuerpo, presentó una demanda de injunction y sentencia declaratoria contra el Gobernador, el Secretario de Hacienda y la Directora de la Oficina de Gerencia y Presupuesto. En ésta, solicitó que la acción del Gobernador se declarase inconstitucional por violar la separación de poderes al reajustar, unilateralmente, el presupuesto del la Cámara de Representantes. Sostuvo además, que el Gobernador no tenía autoridad en ley para aumentar, disminuir o alterar las partidas presupuestarias aprobadas por la Asamblea Legislativa durante el año económico 2004-2005.

Posteriormente, el 28 de septiembre, la ingeniero Nélida Santiago Rivera, en representación de la Superintendencia del Capitolio presentó una demanda de injunction y sentencia declaratoria contra los mismos demandados. En la misma, se reprodujeron, esencialmente, las alegaciones contenidas de la demanda de la Cámara de Representantes. Específicamente se cuestionó el ajuste de cinco millones noventa y nueve mil dólares ($5,099,000.00), en la partida identificada como "Actividades Conjuntas" en la R.C. de C. 927 de la cual, como dijimos, se nutre la Superintendencia del Capitolio. Ambos casos fueron consolidados por el Tribunal de Primera Instancia.

En oposición, el Gobernador indicó que toda vez que el Secretario de Hacienda calculó que las partidas que están vigentes por disposición del Art. VI, Sec. 6 de la Constitución exceden los recursos totales calculados para el año fiscal 2005-2006, y no habiéndose impuesto contribuciones suficientes para cubrir las mismas, él tiene la potestad de hacer los ajustes necesarios para que el presupuesto no sea deficitario.[11]   El Gobernador sostuvo que ello es corolario de su obligación constitucional de hacer cumplir las leyes y de mantener un presupuesto no deficitario.

Indicó que tiene amplia discreción para realizar ajustes a todas las partidas del presupuesto constitucional incluyendo las correspondientes a las otras ramas del gobierno.  Ello en virtud del propio texto de la Constitución, de la Ley Orgánica de la Oficina de Gerencia y Presupuesto y de la sección 2 de la R.C. de la C. 927.  Señaló que la única limitación a su facultad para realizar ajustes a las partidas de una rama de gobierno es que el ajuste impida que esa rama pueda ejercer su función constitucional.  Concluyó indicando que toda vez que ello no ha ocurrido, la reducción en el presupuesto de la Cámara de Representantes y la Superintendencia del Capitolio no adolece de defecto constitucional alguno.

Luego de una vista ante el tribunal de instancia en la que las partes presentaron sus respectivos argumentos, el

_____

[11]  En rigor, es incorrecto hablar de un presupuesto "desbalanceado" pues lo que la Constitución del Estado Libre Asociado de Puerto Rico proscribe es que las asignaciones aprobadas excedan los recursos totales calculados; es decir, un presupuesto deficitario.

pasado 24 de octubre, el Tribunal de Primera Instancia declaró con lugar la demanda instada. El foro primario concluyó que la actuación del Gobernador era contraria a la Constitución por violar la separación de poderes.

Inconforme, los demandados apelaron ante el Tribunal de Apelaciones. En un extenso escrito de apelación los demandados plantearon ante el Tribunal de Apelaciones la comisión de tres errores.[12] Los demandantes por su parte,

---

[12] Los errores señalados por los demandados ante el Tribunal de Apelaciones fueron los siguientes, a saber:

Contrario a lo resuelto por el Tribunal de Primera Instancia, al existir una situación deficitaria, el Primer Ejecutivo no está obligado a desembolsar la totalidad de los fondos autorizados por virtud de la asignación para la Rama Legislativa y sus dependencias accesorias. La conclusión del referido foro: 1. no encuentra apoyo ni en las autoridades legales ni en el sentido común ni en un sentido sano de justicia social; 2. ignora que la actuación del Ejecutivo está claramente sustentada en (a) los poderes deficitarios que le otorga la Constitución y (b) la facultad estatutaria que le concede la Sección 2 de la Resolución Conjunta Núm. 927 de Presupuesto General y; 3. pasa por alto que el esquema dispuesto por la Constitución no suscita problema alguno de separación de poderes y, al contrario, sirve los mejores intereses de la política pública.

Contrario a lo resuelto por el Tribunal de Primera Instancia, no es revisable judicialmente el ajuste realizado por el Primer Ejecutivo a la Asamblea Legislativa, porque 1. los demandantes carecen de legitimación activa; 2. se trata de una cuestión política; y 3. se trata de un ejercicio de la discreción que la Constitución y los estatutos pertinentes expresamente le conceden al Gobernador, análogo al de vetar o firmar un proyecto. La Rama Judicial no debe intervenir cuando la Asamblea Legislativa tiene la autoridad política y constitucional para obtener el remedio que solicita el tribunal.

Aun de entenderse que le ajuste impugnado es revisable judicialmente, el mismo es válido porque

presentaron ante nuestra consideración una petición de certificación. El 1ero de noviembre de 2005 expedimos el auto de certificación solicitado y le concedimos a las partes un término simultáneo para presentar sus respectivos alegatos.

Por su parte, el Senado de Puerto Rico, luego de un fallido intento de litigar esta controversia en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, compareció ante el Tribunal de Primera Instancia impugnando la actuación del Gobernador. Los argumentos esgrimidos por el Senado fueron, fundamentalmente, los mismos que los de la Cámara de Representantes. Aunque, adujo también que la Ley Orgánica de la Oficina de Gerencia y Presupuesto era inconstitucional en la medida en que delegaba en el Gobernador la facultad para establecer las prioridades en los desembolsos sin que se establecieran parámetros adecuados. El foro primario dictó una sentencia en la cual avaló los recortes efectuados a su presupuesto por el Gobernador. Eventualmente acudieron ante este Tribunal el una petición de certificación. Expedimos el auto solicitado y lo consolidamos con el recurso instado por la Cámara de Representantes y la Superintendencia del Capitolio.

Ambas partes han comparecido.[13] Veamos entonces.

---

no ha afectado la capacidad de la Asamblea Legislativa para descargar su función constitucional y sus prerrogativas como cuerpo permanecen inalteradas.
[13] El Procurador General en su escrito invocó las doctrinas de legitimación activa y cuestión política para expresar que a su juicio, la controversia planteada en el caso de epígrafe no es justiciable. Dichos planteamientos son inmeritorios.

## II

El presupuesto del Estado en su sentido más amplio representa el plan de ordenación racional de la actividad financiera del Estado para un período determinado, con el fin de concretizar, a través del mismo, la obra de gobierno. El presupuesto general de un gobierno, señala Muñoz Amato, "debe ser el programa que dirija toda la actividad gubernamental en su función de orientar los procesos sociales y servir los intereses del pueblo." P. Muñoz Amato, *Introducción a la Administración Pública, Teoría General, Planificación – Presupuestos*, Fondo de Cultura Económica, México, 4ta ed., 1966, pág. 141. Véase además, A. Rodríguez Bereijo, *El Presupuesto del Estado*, Madrid, Ed. Tecnos, 1970; Guzmán Santiago, Aspectos Legales del Proceso Presupuestario del Gobierno del Estado Libre Asociado de Puerto Rico, 36 *Rev. Jur. U.P.R.* 291 (1966).

El presupuesto es por lo tanto mucho más que una contabilización de ingresos y gastos desligado de todo esfuerzo para encausar la obra de gobierno y lograr alcanzar determinados fines sociales. Es, verdaderamente, un plan de acción gubernamental expresado en términos financieros.

---

No hay duda alguna que los peticionarios, tienen legitimación activa pues alegan haber sufrido un daño palpable, real y concreto toda vez que el Gobernador, con su acción, les ha reducido sus presupuestos operacionales afectándose así la labor que desempeñan. *Hernández Torres v. Hernández Colón*, 131 D.P.R. 593 (1992); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988). Por otro lado, no están presente en esta controversia los criterios necesarios para aplicar a la misma la doctrina de cuestión política. *Noriega, supra; Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986). "El mero hecho de que el pleito bus[que] la protección de un derecho político no quiere decir que [éste] presenta una cuestión política." *Silva, supra*, pág. 54.

La experiencia ha demostrado que es preferible encomendar la formulación del proyecto de presupuesto a la rama con el conocimiento que ese proceso encarna, la Rama Ejecutiva. Dicho procedimiento requiere sin embargo, que se enmarque dentro de las normas legislativas preexistentes y que se someta a la revisión activa de los representantes del pueblo, de ahí la injerencia de la Asamblea Legislativa. La participación de la Legislatura en este proceso garantiza que los programas públicos adoptados contengan una base democrática efectiva y real.[14]

---

[14] Nos parecen muy ilustradoras y sabias las siguientes expresiones de don Pedro Muñoz Amato, --uno de los redactores del informe a la Convención Constituyente sobre la Rama Legislativa preparado por la Escuela de Administración Pública de la Universidad de Puerto Rico-- cuando indicó, al hablar sobre la participación de la Legislatura en el proceso se aprobación de un presupuesto, lo siguiente:

> Es cierto que la participación legislativa comporta graves riesgos: el de que los legisladores no posean suficiente entendimiento de las necesidades particulares de los distintos servicios; que no tenga la visión global del programa; que prefieran defender los intereses locales de sus respectivos distritos a costa del bienestar general; que estén dispuestos a ceder a la demagogia por no perder votos; que decidan intercambiar favores en vez de crear un programa adecuado para el gobierno.
>
> **Pero éstos son los riesgos inevitables del gobierno democrático. Hay que armonizar la pericia de los gobernantes con la participación del pueblo. Si se elimina esta última, el riesgo de que los gobernantes actúen por cuenta propia sin atender los intereses del pueblo es aún más peligroso. En lo que toca al presupuesto, instrumento importantísimo del gobierno, ya sabemos que la lucha por someterlo al control legislativo fue una de las etapas decisivas en el desenvolvimiento del liberalismo y la democracia.** (Énfasis nuestro.)

P. Muñoz Amato, Introducción a la Administración Pública, Teoría General, Planificación – Presupuestos, Fondo de Cultura Económica, México, 4ta ed., 1966, pág. 174.

Con ello en mente, procedemos a repasar el proceso presupuestario puertorriqueño.

# III

## A

La Constitución del Estado Libre Asociado de Puerto Rico contiene cuatro disposiciones básicas sobre el presupuesto. En el Art. IV, Sec. 4, se expresa:

Los deberes, funciones y atribuciones del Gobernador serán:

Presentar a la Asamblea Legislativa, al comienzo de cada sesión ordinaria, un mensaje sobre la situación del Estado y someterle además un informe sobre las condiciones del Tesoro de Puerto Rico y los desembolsos propuestos para el año económico siguiente. Dicho informe contendrá los datos necesarios para la formulación de un programa de legislación.

El Art. VI, Sec. 6 provee:

Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

El Art. VI, Sec. 7 prescribe:

Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por la ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.

El Art. VI, Sec. 8 nos advierte lo que sucede cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, a esos efectos indica:

Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de interés y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley.

Complementa este diseño, el Art. III, Sec. 20, que consigna:

Al aprobarse cualquier proyecto de ley que asigne fondos en más de una partida, el Gobernador podrá eliminar una o más partidas o disminuir las mismas, reduciendo al mismo tiempo los totales correspondientes.

El conjunto de estas disposiciones se estimó constituían "un plan mínimo para mantener la estabilidad del país." IV *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. 1961, pág. 2587 (*"Diario de Sesiones"*). Las mismas proceden del Art. 34 de la Ley Jones de 1917, 39 Stat. 962 (48 U.S.C. sec. 841)("Ley Jones") aunque con cambios importantes como resultado de la aprobación de la Constitución que proveyó para la organización de nuestro gobierno; y, ante la realización de que el presupuesto es el principal instrumento de la administración fiscal. *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, U.P.R., pág. 418.

A poco que analicemos las disposiciones constitucionales a que hemos hecho referencia, nos percatamos que fue la intención de la Asamblea Constituyente proveer un procedimiento de estrecha interrelación, pero flexible, entre el Poder Ejecutivo y el Poder Legislativo; proceso que permitiera aprobar el presupuesto del país para implantar así el programa de gobierno, salvaguardando a la misma vez la

salud fiscal del país y el clima de inversión. Para ello se hilvanaron cuidadosamente entre sí distintas disposiciones de la Constitución. Véase, Guzmán Santiago, *op. cit.*, pág. 308 ("La Constitución establece una coordinación estrecha entre las ramas ejecutiva y legislativa en la elaboración del presupuesto. . . .")

El Informe preparado por la Comisión de la Rama Legislativa de la Asamblea Constituyente describió con gran claridad el proceso presupuestario antes descrito. En éste se señala, citamos *in extenso*: "En primer lugar, el Gobernador debe presentar a la Asamblea Legislativa un mensaje sobre el estado del gobierno y además un informe detallado sobre los propuestos ingresos y desembolsos para el próximo año. Las asignaciones que haga la Asamblea Legislativa no podrán exceder el cálculo de los recursos totales, a menos que se impongan contribuciones suficientes para cubrir el exceso. Si a pesar de esta precaución los recursos disponibles no son suficientes para cubrir las asignaciones se debe establecer un orden de prioridades comenzando con el pago de intereses y amortización de la deuda pública. Esta prioridad constitucional se adopta con el propósito de asegurar garantías para mantener el crédito público, tan necesario para el mejoramiento económico del pueblo. Finalmente, habrá una reasignación automática de fondos en el caso de que en un año determinado no se aprueben las asignaciones necesarias. Esta última disposición ha probado su eficacia en dos ocasiones durante las última décadas." IV *Diario de Sesiones*, pág. 2587.

Veamos pues en mayor detalle las distintas etapas del referido proceso.

**B**

Por mandato del Art. IV, Sec. 4, cl. 9, de la Constitución, el trámite legislativo para la aprobación del presupuesto comienza precisamente con el mensaje de Estado del Gobernador a la Asamblea Legislativa. La Constituyente tuvo la intención de requerirle al Gobernador que le proveyera a la Legislatura información completa que le permitiera a ésta velar porque el Primer Ejecutivo cumpliera con la obligación de que las asignaciones propuestas no excedieran los recursos, y ésta a su vez cumplir con la suya de aprobar las asignaciones correspondientes para el próximo año fiscal, precisamente, dentro de esos mismos parámetros. II *Diario de Sesiones*, págs. 892-894.

Nótese que el Informe de la Rama Legislativa vincula el informe de ingresos y desembolsos con la obligación dispuesta en el Art. VI, sec. 7 de la Constitución de que las asignaciones no excedan el cálculo de los recursos totales a menos que se provea la imposición de contribuciones suficientes para cubrir las asignaciones. Véase además, II *Diario de Sesiones*, págs. 892-894. Por lo tanto, **es al inicio del año fiscal para el cual se aprueba el presupuesto de gobierno que hay que cumplir con el mandato de que las asignaciones hechas no excedan los recursos totales calculados para el año económico en cuestión que ordena la Sec. 7.**

Cónsono con ello, el Art. III, Sec. 20, de la Constitución, Art. III, Sec. 20, faculta al Gobernador para que al aprobar cualquier proyecto de ley que asigne fondos en más de una partida, pueda rebajar o eliminar partidas reduciendo al mismo tiempo los totales correspondientes. El Informe de la Rama Legislativa indicó que esta disposición "[h]ace posible la integración de un programa económico, permitiendo al Gobernador eliminar partidas innecesarias. Sirve para que el Gobernador pueda desalentar la práctica de concesiones mutuas ("log rolling") entre los legisladores. IV *Diario de Sesiones*, pág. 2586. Véase además, II *Diario de Sesiones*, págs. 878-880; Muñoz Amato, *op. cit.*, pág. 184 ("El veto detallado da al poder ejecutivo una última oportunidad de integrar su programa de trabajo contrarrestando la tendencia de los legisladores a proteger sus respectivos propósitos particulares y hacerse concesiones mutuas, a costa del interés general.")

Es evidente por tanto que la Constituyente aprobó este tipo de veto precisamente como una medida para controlar excesos en las asignaciones. En ese sentido, son ilustradoras las siguientes expresiones contemporáneas a la aprobación de la Constitución: "One of the purposes of the item veto is to enable the Governor to make sure that expenditures do not exceed anticipated revenues. In this respect it is a budget-balancing device which permits the Governor to eliminate or reduce items without vetoing the entire appropriation bill. " *Notes & Comments on the*

*Constitution of the Commonwealth of Puerto Rico,* Washington D.C., 1953, pág. 73 (*"Notes & Comments"*).

De otra parte, la Sec. 7, que exige que las asignaciones hechas no excedan los recursos totales calculados, fue objeto de amplio debate en el seno de la Constituyente y la misma se incluyó en la Constitución por recomendación de varios especialistas en finanzas para fortalecer el buen crédito del Estado Libre Asociado, específicamente, con los tenedores de bonos.  J. Trías Monge, *Historia Constitucional de Puerto Rico*, Ed. U.P.R., 1983, vol. III, pág. 224; *Notes & Comments*, pág. 104.

Del debate sobre esta sección se desprende que la Asamblea Constituyente amplió el ámbito de acción presupuestal --en comparación con la Ley Jones-- al sustituir el concepto de "rentas totales" que utilizaba la Ley Jones en la disposición precursora de la Sec. 7[15], por el de "recursos totales calculados" a fin de proveer, **inicialmente**, una base más amplia para las asignaciones.  Ello así ya que las "rentas totales" incluía tan sólo los ingresos contributivos y los excedentes que pudieran estar disponibles de ejercicios económicos anteriores, mientras que la frase "recursos

---

[15] El último párrafo de la Sec. 34 de la Ley Jones disponía:

> La Asamblea Legislativa no hará ninguna asignación ni autorizará ningún gasto, en virtud de la cual o del cual los gastos del Gobierno de Puerto Rico durante cualquier año económico excedan **las rentas totales provistas** a la sazón por ley y aplicables a dicha asignación o gasto, incluyendo cualquier superávit disponible en el Tesoro, a menos que la Asamblea Legislativa al hacer dicha asignación disponga de una contribución suficiente dentro del referido año económico. (Énfasis nuestro.)

totales calculados" se empleó para incluir también todo tipo de ingresos no contributivos, tales como ayudas federales, el producto de emisiones de bonos, el de la venta de propiedades y los sobrantes de los beneficios obtenidos por las corporaciones públicas entre otros. Trías Monge, *op. cit.*, vol. III, pág. 1225; II *Diario de Sesiones*, pág. 893.

Conforme al diseño descrito, podemos concluir que la Constitución proveyó los mecanismos necesarios para velar por que al inicio del año económico se cumpliera con la limitación de la Sec. 7 y son éstos, a saber:  la imposición de contribuciones y el veto de partidas. **Queda claro también de la discusión que antecede que la Constitución obliga tanto la Asamblea Legislativa como al Primer Ejecutivo a cumplir con el mandato del Art. VI, la Sec. 7 de la Constitución.**

La Legislatura no puede, a sabiendas, aprobar un presupuesto cuyas asignaciones excedan los recursos totales calculados; para hacerlo, tiene que proveer para la imposición de contribuciones. Tampoco puede negarse, festinadamente, a procurar las contribuciones necesarias que permitan aumentar los recursos totales disponibles, ante la eventualidad de que éstos sean insuficientes para cubrir las asignaciones para el año económico en cuestión.  Ello supondría que la Asamblea Legislativa actúa,  a consciencia, en contravención con su obligación constitucional.  *E.g.,* *Board of County Comm'rs v. Vail Associates, Inc.*, 19 P.3d 1263, 1274 (Colo. 2001)("the General Assembly cannot refuse to exercise its taxation authority; it must  enact tax statutes so that governmental operations may be funded.")  En

igual sentido, *People ex rel Thomas v. Scott*, 12 P. 608, 611 (Colo. 1886); *Jonhson v. McDonald*, 49 P.2d 1017 (Colo. 1935).

Ahora bien, si al final del año económico existieran asignaciones aprobadas para las cuales no hubiesen recursos disponibles, esas asignaciones serían nulas por ser contrarias a lo dispuesto en el Art. VI, Sec. 7 de la Constitución y por lo tanto, no serían obligatorias para el Ejecutivo. De esta forma se hace efectivo el mandato de la Sec. 7. El lenguaje de la Sec. 7 es claro e inequívoco. En términos absolutos dispone que: "[l]as asignaciones hechas para un año económico **no podrán exceder** de los recursos totales calculados. . . ." (Énfasis nuestro.) Por lo tanto, se impone la conclusión antes indicada respecto la nulidad de cualquier asignación aprobada para la cual al final del año fiscal no hubiesen los recursos.

Cabe señalar aquí que la Sec. 7 calca esencialmente las disposiciones del Art. V, Sec. 16 de la Constitución de Colorado de 1876, por lo que la jurisprudencia del Tribunal Supremo de Colorado interpretando esta disposición es altamente persuasiva, muy en especial, si la misma antecede la aprobación de nuestra Constitución. Véase, Trías Monge, *op. cit.*, vol. II, pág. 100; *Notes & Comments*, pág. 103, n. 6.

En ese sentido es menester apuntar que el Tribunal Supremo de Colorado ha resuelto que, el Art. V, Sec. 16 de su Constitución, obliga tanto al Poder Legislativo y al Poder Ejecutivo y que **toda asignación que viole la disposición es nula y no obliga al estado**. También, ha resuelto que el

Gobernador tiene todo el año económico para cumplir con dicha

obligación de manera que la nulidad de la asignación no puede

plantearse ante un tribunal hasta terminado el año fiscal.

Sobre este particular, en el caso seminal, *In re*

*Appropriations by General Assembly*, 22 P. 464, 466 (Colo. 1889),

el Tribunal Supremo de Colorado indicó lo siguiente:

> This language needs no construction.  It is plain,
> simple and unambiguous.  It need not be misunderstood.
> It cannot be evaded.  It means that the state cannot
> be plunged into debt by unauthorized legislation.  If
> the general assembly pass acts making such
> appropriations or authorizing expenditures in excess
> of constitutional limits, such acts are void.  **They
> create no indebtedness against the state, and entail
> no obligation, legal or moral, upon the people, or no
> any future general assembly.**  (Énfasis nuestro.)

Véase, *In re Prioriy of Legislative Appropriations*, 34 P. 277

(Colo. 1893); *Parks v. Commissioners of Soldiers' & Sailors'*

*Home*, 43 P. 542 (Colo. 1896); *Johnson v. McDonald*, *ante*. Véase

además, *Lake County v. Rollins*, 130 U.S. 662 (1889).

Por otro lado, en *People v. Armstrong*, 90 P.2d 522, 526

(Colo. 1939), se indicó lo siguiente:

> It is established by the decisions of this court,
> considering the above sections of the Constitution,
> that when the entire revenue of a given fiscal year
> has been exhausted the legislative appropriations for
> that year remaining unpaid, or any unpaid portions
> thereof, are totally void, constitute no debt and
> impose no obligation, legal or moral, upon the people
> or upon any future general assembly.
>
> It is equally certain, as the authorities
> recognize, that this void status, however, may not be
> declared until the total revenues for the fiscal
> year involved properly shall have been applied to
> payment of said appropriations, and only after this
> process is entirely complete do any such
> appropriations or any portion thereof become finally
> void.  Therefore, no matter how dire the estimate or
> dark the forecast as to revenue for any
> fiscal year, **no appropriation for that period can**

**be declared void for deficiency of revenue previous to the expiration of that fiscal year.** (Énfasis nuestro.) (Citas omitidas.)

Con gran previsión entonces, la Asamblea Constituyente proveyó el orden en que se pagarán las asignaciones cuando al final del año económico los recursos no basten.  En ese caso, el Art. VI, Sec. 8, dispuso que se procederá al pago de intereses y amortización de la deuda pública y luego se harán los demás desembolsos, de acuerdo con la norma de prioridades que se establezcan por ley.  Véase Ley Orgánica de la Oficina de Gerencia y Presupuesto, Art. 4(c), 23 L.P.R.A. sec. 104(c).

La Sec. 8 fortaleció la prelación absoluta de los pagos correspondientes a la deuda pública llevando el principio a categoría de norma constitucional.  Véase, IV *Diario de Sesiones*, pág. 2587.  "This provision serves as a guarantee to purchasers of governmental securities." *Notes & Comments,* pág. 104.  Véase además, Trías Monge, *op. cit.,* vol. III, págs. 223-224.  Esta sección se aprobó sin discusión alguna.  II *Diario de Sesiones*, pág. 899.

El Art. VI, Sec. 8 es a todas luces, una medida cautelar que aplicaría cuando a pesar de la "precaución" de la Sec. 7, los recursos disponibles no fueran suficientes, por lo tanto esta disposición constitucional **opera normalmente al finalizar el año económico** en cuestión pues es en ese momento que se conoce si los recursos totales disponibles son suficientes para cubrir las asignaciones aprobadas.  Adviértase que la Legislatura, por estar en sesión dos veces al año, tiene la oportunidad de enfrentarse en cualquier

momento al problema de insuficiencia de recursos aprobando las medidas de recaudos necesarias para enjugar la deficiencia proyectada.

Ahora bien, aunque de ordinario el Art. VI, Sec. 8, operará al final del año económico, a manera de excepción y ateniéndonos al fundamento principal del esquema presupuestario establecido en la Constitución, que no es otro sino velar por el buen nombre del crédito del país, es precedente concluir que en situaciones en las cuales se encuentre seriamente amenazado el crédito del Estado Libre Asociado, el Gobierno puede optar por seguir las prioridades establecidas en la Constitución **antes de concluir un año económico y no acudir a la Legislatura a procurar la imposición de contribuciones.**

Conforme indicamos, la Sec. 8 refirió para acción legislativa la determinación del orden de prelación a seguir. La disposición constitucional supuso un cambio significativo con lo dispuesto hasta entonces en la segunda Acta Orgánica ya que en ésta, contrario a la Constitución, se prescribía específicamente un orden de prioridades, alterable por el Gobernador, que situaba en primer término: **"Los gastos ordinarios de los departamentos legislativo, ejecutivo y judicial del Gobierno del Estado y los intereses de cualquier deuda pública."**[16]   Trías Monge advierte, "la disposición

---

[16] En lo pertinente, el párrafo 19 de la Sec. 34 de la Ley Jones disponía:

> En caso de que las rentas disponibles de Puerto Rico para cualquier año económico, . . ., sean insuficientes para hacer frente a todas las

finalmente adoptada por la Convención colocó en absoluto primer término, y fuera del alcance del Gobernador, el pago de intereses y amortización de la deuda pública." Trías Monge, *op. cit.*, vol. III, pág. 225.

Finalmente, la Asamblea Constituyente contempló la posibilidad que al concluir un año económico, ni el Ejecutivo ni el Legislativo se pudieran poner de acuerdo sobre la aprobación de las asignaciones necesarias para el próximo año fiscal. Para estos casos proveyó en el Art. VI, Sec. 6, un mecanismo transitorio que permite que continúe operando el gobierno. La Sec. 6 dispuso que continuarán rigiendo **las partidas** consignadas en las leyes aprobadas para el año económico anterior y que el Gobernador tendrá la facultad para autorizar los desembolsos necesarios para el pago de los intereses y amortización de la deuda pública y los gastos ordinarios de funcionamiento del gobierno, hasta que se aprueben **las asignaciones** correspondientes. Este texto proviene, como indicamos, de la Sec. 34 de Ley Jones.[17] IV

-------------------

asignaciones votadas por la Asamblea Legislativa para dicho año, tales asignaciones se pagarán en el siguiente orden, a menos que se disponga otra cosa por el Gobernador.

   Primera clase. **Los gastos ordinarios de los departamentos legislativo, ejecutivo y judicial del Gobierno del Estado**, y los intereses de cualquiera deuda política, deberán pagarse primero en su totalidad. (Énfasis nuestro.)

[17] El lenguaje de la Ley Jones a su vez proviene de una enmienda (enmienda Olmstead) efectuada a la Ley Foraker en el 1909. La enmienda se produjo como consecuencia de eventos acaecidos en el 1909 cuando por un *impasse* entre la Cámara de Representantes y el Consejo Ejecutivo, la Asamblea Legislativa terminó sus sesiones sin haber aprobado el proyecto de presupuesto o asignaciones necesarias para el sostenimiento del Gobierno durante el año económico 1909-

*Diario de Sesiones*, pág. 2587. Véase además, Trías Monge, *op. cit.*, vol. III, pág. 223.

De entrada, llama la atención la distinción que se hace en la disposición entre asignación y partida. La misma es indicativa que los Constituyentes estimaron que asignación no es sinónimo de partida al disponer que, **es lo último y no lo primero lo que permanece vigente automáticamente por operación del Art. VI, Sec. 6.**

Asignación es un concepto más amplio que partida. Asignación se refiere a la autoridad en ley para el desembolso de una suma de dinero; o dicho de otro modo, asignación es la designación por la Asamblea Legislativa de cierta cantidad de dinero para algún propósito en específico.[18] Véase, *People v. Kennehan*, 136 P. 133, 1037 (Colo. 1913) ("[An appropriation is the legislative] designation of a certain amount [of money] as being set apart, alloted, or assigned for a specific purpose.") Partida por su parte, es la suma de dinero así designada. *E.g.*, *Colorado General Assembly v. Lamm*, 704 P.2d 1371, 1384 (Colo. 1985)("In the constitutional sense, an 'item' (partida) of an appropriation bill is an indivisible sum of money dedicated to a stated purpose. . . .") En igual sentido, *Branult v. Holleman*, 230 S.E.2d 238, 242 (Va. 1976).

_____

1910. **Ello, como era de esperarse, produjo una situación crítica por la falta de autorización legislativa para usar fondos públicos para sufragar los gastos necesarios del gobierno.** *Buscaglia v. Corte*, 64 D.P.R. 11, 28-30 (1944).

[18] Véase, Ley de Contabilidad del Gobierno, Art. 3, Ley Núm. 230 de 23 de julio de 1974, 3 L.P.R.A. sec. 283g.

Por lo tanto, el concepto partida del Art. VI, Sec. 6, de la Constitución se refiere a la cantidad de dinero designada como tope para cada agencia, instrumentalidad, organismo gubernamental, o rama de gobierno, que por virtud de la Constitución sobrevive la vigencia temporal de la resolución conjunta de presupuesto al final del año económico.

De otra parte, la discusión durante la Asamblea Constituyente de esta sección arroja poca luz sobre el significado de la última frase de la misma, que faculta al Gobernador a "autorizar[. . .] los desembolsos necesarios" para el pago de los gastos ordinarios y de los intereses y amortización de la deuda pública. Esta frase debe interpretarse en conjunto con lo dispuesto en el Art. VI, Sec. 9 de la Constitución, que ordena que sólo se dispondrá para el desembolso de fondos públicos "por autoridad de ley." Por lo tanto, al autorizar al Gobernador a efectuar los desembolsos de las partidas vigentes, la Constitución lo que pretende **es conferirle la autoridad en ley para que en efecto se puedan hacer los mismos, ante la extinción de las asignaciones contenidas en la Resolución Conjunta.** Éste a su vez utilizará un mecanismo de "carácter legislativo" como lo es la orden ejecutiva, para efectuar los desembolsos correspondientes.

Adviértase, como indicamos, que la resolución conjunta de presupuesto con sus respectivas asignaciones se extingue al cierre del año fiscal, por lo que desaparece la autoridad en ley para efectuar desembolsos. Sin tal autoridad no

procede dispendio de fondo alguno. En *Ortiz Reyes v. Mac Leod, Auditor*, 56 D.P.R. 871, 877 (1940) indicamos lo siguiente: "Está claramente dentro de los poderes de la Asamblea Legislativa el tener el control general de los gastos de los fondos públicos, **pero esto es así siempre que no se desembolsen ningunos fondos sin haberse hecho una asignación previa para tal fin**." (Énfasis nuestro.) Véase también, *Pueblo v. Márquez*, 62 D.P.R. 13 (1943).

Para resumir, la última frase del Art. VI, Sec. 6 de la Constitución no pretende conferirle al Gobernador amplias facultades para confeccionar un presupuesto como se ha sugerido, su alcance es más limitado. La misma simplemente pretende suplir el requisito de "autoridad de ley" de que habla el Art. VI, Sec. 9 de la Constitución, confiriéndole específicamente tal autoridad al Gobernador. Éste a su vez hace efectiva su autoridad a través de una orden ejecutiva --que tiene fuerza de ley-- y ordena los desembolsos **de las partidas que se auto-renovaron**. De lo contrario existirían unas partidas vigentes que no se podrían utilizar.

Esta interpretación es acorde con la transitoriedad del mecanismo que se dispone en la Sec. 6, que lo que pretende es permitir que el gobierno continúe operando ante un *impasse* entre el Ejecutivo y el Legislativo. No cabe interpretar el mismo como una concesión de facultades absolutas al Gobernador sobre le proceso presupuestario que le permita disminuir unilateralmente la partida correspondiente a la Asamblea Legislativa.

Pasemos ahora a repasar someramente el ordenamiento estatutario referente a la confección y administración del presupuesto.

**D**

Como vimos, la Constitución diseñó un cuidadoso esquema para procurar la aprobación del presupuesto del país. Dejó a la discreción de la Rama Ejecutiva y la Rama Legislativa establecer por ley el procedimiento para la confección del mismo, así como también el establecimiento de las prioridades en los desembolsos públicos cuando los recursos disponibles no basten para cubrir las asignaciones en un año económico. En esta etapa del procedimiento el actor principal es el Primer Ejecutivo. **De ahí la deferencia debida al Poder Ejecutivo respecto sus determinaciones durante el proceso de confección del proyecto de presupuesto; muy en particular en lo que se refiere a la determinación o estimación de los recursos totales disponibles para un año económico.** No obstante, en sistemas donde se respeta la separación de poderes, "las ramas legislativas y judicial tienen un alto grado de autonomía, que se garantiza en el proceso presupuestal permitiéndoseles la formulación independiente de sus estimados. . . ." Muñoz Amato, *op. cit.,* pág. 166.

A tales efectos, en el 1980 se aprobó la ley orgánica de lo que hoy conocemos como la Oficina de Presupuesto y Gerencia ("OPG"), adscrita a la Oficina del Gobernador. Ley Núm. 147 de 18 de junio de 1980, 23 L.P.R.A. secs. 101 *et seq*. La misma derogó la Ley de Planificación y Presupuesto, antigua Ley Núm. 213 de 12 de mayo de 1942, según enmendada.

La nueva ley perseguía recoger en una sola pieza legislativa todas las disposiciones relativas a la formulación y ejecución del presupuesto del país.

A grandes rasgos, la Oficina de Presupuesto y Gerencia ejerce una variedad de funciones bajo la tutela del Primer Ejecutivo, encaminadas todas a velar  --como indica su nombre-- por la eficiente administración del presupuesto y la gerencia de los organismos gubernamentales.  La ley dispone, entre otras cosas, que la Oficina "asesorará al Primer Ejecutivo, a **la Asamblea Legislativa y a los organismos gubernamentales** en asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones. . . ."  23 L.P.R.A sec. 103(a). (Énfasis nuestro.)[19]

El Art. 3 de la ley enumera las facultades y prerrogativas de la Oficina.  Las únicas referencias relevantes contenidas en dicho artículo sobre la Asamblea Legislativa son, primero, la sección ya mencionada donde se le reconoce a la OGP un rol de "asesor" de la Asamblea Legislativa en asuntos presupuestarios, programáticos y de gerencia administrativa.  **La segunda, deja establecido que el manejo del presupuesto de la Asamblea Legislativa es asunto interno de esa Rama.  Así, la ley dispone:  "La**

---

[19] Nótese que este artículo distingue entre la Asamblea Legislativa y los organismos gubernamentales; claramente, estos últimos se refieren a los organismos de la Rama Ejecutiva. Según se desprende de la Ley Orgánica de la Oficina de Gerencia y Presupuesto y como es natural, ésta tiene amplia facultad para intervenir en los asuntos presupuestarios de estos últimos.

**administración, ejecución y control del Presupuesto de la Rama Legislativa recaerá en los Presidentes del Senado y de la Cámara de Representantes, respectivamente."** 23 L.P.R.A. sec. 103(b)(2)(K). (Énfasis nuestro.)

Conforme a lo antes expuesto, es forzoso concluir que la Oficina de Gerencia y Presupuesto no tiene injerencia alguna en el proceso de formulación, presentación y posterior administración y ejecución del presupuesto recomendado para la Asamblea Legislativa.

Abona a nuestra conclusión el Art. 4 de la Ley Orgánica de la OGP, donde se enumeran las facultades y atribuciones del Gobernador en relación al presupuesto. Allí se establece la obligación del Gobernador de presentar a la Asamblea Legislativa al comienzo de cada sesión ordinaria un presupuesto anual que contenga "las asignaciones y egresos que se recomiendan o proponen con cargo a todos los recursos calculados" **excepto** que **"la Asamblea Legislativa y la Oficina del Contralor del Estado Libre Asociado de Puerto Rico, estarán exentos de someter peticiones presupuestarias, las cuales el Gobernador incluirá en el presupuesto que recomiende, un presupuesto para gastos ordinarios de funcionamiento, igual al vigente."** (Énfasis nuestro.) 23 L.P.R.A. sec. 104(a)(7). Esta disposición está en sintonía con lo señalado anteriormente respecto la autonomía que goza la Asamblea Legislativa en la confección y administración de su presupuesto. Además, y cónsono con lo anterior, queda claro que el presupuesto recomendado para la Asamblea

Legislativa para un año económico **no podrá ser menor que el vigente.**

El Art. 4(c), 23 L.P.R.A. sec. 104(c) a su vez, dispone las normas de prelación para los desembolsos públicos cuando los recursos disponibles para un año económico no son suficientes para cubrir las asignaciones para ese año según ordena el Art. VI, Sec. 8 de la Constitución.  El orden provisto en la ley para el pago es el siguiente, a saber:  Primero, ordena el pago de los intereses y amortizaciones correspondientes a la deuda pública, tal y como exige la Constitución.  Segundo, se atienden los compromisos contraídos en virtud de contratos válidos, sentencia emitidas en casos de expropiación forzosa y "obligaciones ineludibles para salvaguardar el crédito, y la reputación y el buen nombre del Gobierno del Estado Libre Asociado de Puerto Rico."  23 L.P.R.A. sec. 104(c)(2).

En tercer lugar, se atienden los desembolsos relacionados con:  1) la conservación de la salud pública; 2) la protección de personas y de la propiedad; 3) los programas de instrucción pública; 4) los programas de bienestar público; 5) el pago de las aportaciones patronales a los sistemas de retiro y el pago de pensiones a individuos concedidas por leyes especiales; y, 6) los demás servicios públicos en el orden de prioridades que el Gobernador determine.  23 L.P.R.A. sec. 104(c).

Llama la atención inmediatamente el hecho que la sección nada provee respecto los desembolsos de los gastos ordinarios de funcionamiento de la Rama Legislativa  o  la  Rama Judicial,

como disponía expresamente la Sec. 34 de la Ley Jones. **La única explicación razonable tiene que ser que el Art. 4(c) ordena las prioridades para la Rama Ejecutiva exclusivamente. De lo contrario, habría que concluir que no es prioritario para el Estado ordenar el desembolso de los gastos ordinarios para el funcionamiento de dos de las tres ramas del gobierno; o, que ello fuera una omisión involuntaria. Ninguna de estas dos "explicaciones" parece razonable o sensata.**

Esta posición es congruente con lo ya discutido anteriormente respecto la autonomía de la Asamblea Legislativa en sus asuntos presupuestarios. Cualquier interpretación sobre este tema tiene que tomar en consideración, como elemento fundamental, el cambio significativo ocurrido en Puerto Rico en el 1952 con la aprobación de la Constitución del Estado Libre Asociado. Este documento estableció un gobierno propio compuesto por tres ramas co-iguales ninguna de las cuales está subordinada a la otra. Esta estructura a su vez supuso dejar atrás, entre otras cosas, la hegemonía presupuestal del ejecutivo sobre "los departamentos legislativo y judicial" de la Ley Jones, con los vestigios coloniales que ello entrañaba. Y es que el manejo del presupuesto implica de suyo, priorizar los intereses de la rama y ordenar los fondos necesarios para adelantar los mismos. Esa es una función que le compete a cada rama con independencia de los otros poderes. Véase, Art. III, Sec. 9 de la Constitución. En su consecuencia, corresponderá a cada rama en el descargo de su responsabilidad para atender sus asuntos internos, hacer los

ajustes necesarios a su presupuesto para afrontar una situación de estrechez fiscal.

Establecido el marco doctrinal aplicable pasemos a resolver la controversia planteada.

## IV

El Gobernador del Estado Libre Asociado de Puerto Rico ha indicado que su facultad para reducir unilateralmente los fondos asignados a la Cámara de Representantes y la Superintendencia del Capitolio así como al Senado de Puerto Rico, surge de su obligación constitucional de hacer cumplir las leyes y de mantener un presupuesto en el cual las asignaciones no excedan los recursos totales calculados.  Indicó que tiene discreción para hacer los ajustes que estime correspondiente en virtud del texto mismo de la Constitución, específicamente, del Art. VI, Secs. 6 y 8, del Art. 4 de la Ley Orgánica de la Oficina de Gerencia y Presupuesto y, de la sección 2 de la R.C. de la C. 927.  No le asiste la razón.

## A

No hay duda que la facultad que se abroga el Gobernador de reducir unilateralmente el presupuesto de otra rama de gobierno **es extraordinaria**.  Parecería razonable en su consecuencia que la misma trasluciera del texto de la Constitución si esa hubiese sido la intención de los Constituyentes; particularmente, ante el cuidadoso esquema presupuestario provisto en la Constitución. El silencio es entonces muy elocuente.  En esta ocasión, procede interpretar ese silencio como una prohibición expresa.

Conforme discutimos, la autorización que le confiere al Gobernador el Art. VI, Sec. 6 de la Constitución, para ordenar **los desembolsos necesarios** de las partidas relacionadas con el pago de los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública, solo pretende conferirle al Primer Ejecutivo la autoridad en ley necesaria para efectuar los desembolsos de las partidas que se auto-renovaron al extinguirse la asignación correspondiente. De lo contrario, existirían unas partidas vigentes que no se podrían utilizar.

No constituye esta expresión, como ha argumentado el gobierno, una carta blanca para "reconfeccionar" las partidas vigentes reasignado fondos originalmente provistos para la Cámara de Representantes, la Superintendencia del Capitolio y el Senado de Puerto Rico, para aumentar las partidas de algunas agencias del Ejecutivo. La Sec. 6 sólo habla de autorizar aquellos desembolsos de las partidas que se auto-renovaron, sin más. **La Sec. 6 se visualizó como un mecanismo transitorio no como una concesión extraordinaria de poder que permita reducir unilateralmente el presupuesto de otra rama de gobierno.**

El Art. VI, Sec. 7, por otro lado, tampoco le brinda apoyo al Gobernador porque esta disposición sólo se refiere a la obligación del la Rama Legislativa y la Rama Ejecutiva de confeccionar y aprobar un presupuesto en el cual las asignaciones hechas no excedan los recursos totales calculados y si durante el año económico se vislumbra que los recursos no bastaran procede la imposición de contribuciones.

El Gobernador entiende que como corolario de su obligación de hacer cumplir las leyes, debe velar porque el presupuesto, en todo momento, cumpla con lo ordenado en la Sec. 7 y **para ello tiene que llevar a cabo los recortes que estime procedente a la Rama Legislativa y así diseñar un presupuesto no deficitario. Esta posición extrema no encuentra apoyo en la disposición constitucional invocada, mientras que trastoca el fino balance entre los Poderes Ejecutivo y Legislativo.**

La solución que provee la Constitución no es tan radical. Como indicamos ya, ésta provee para la aprobación de las contribuciones necesarias de suerte que las asignaciones no excedan los recursos totales. Si por el contrario no se aprueba legislación en esa dirección y, al cierre del año económico perduran asignaciones en exceso de los recursos totales, éstas serán nulas y no obligarán al Primer Ejecutivo por ser contrarias al mandato constitucional. Así opera la Sec. 7.

La Sec. 8 por su parte, sólo ordena el pago de los intereses y amortización de la deuda pública cuando los recursos totales sean insuficientes para cubrir las asignaciones. Ésta entrelaza con el Art. 4(c) de la Ley Orgánica de la OGP y como ya vimos, **este artículo ordena las prioridades para la Rama Ejecutiva, no en las otras ramas del gobierno.**

Concluimos por lo tanto que el Gobernador carece de facultad constitucional para reducir unilateralmente el

presupuesto de la Cámara de Representantes, la Superintendencia del Capitolio y el Senado de Puerto Rico.

**B**

Por último, el Gobernador ha argüido que la sección 2 de la R.C. de la C. 927, le permite hacer los reajustes presupuestarios impugnados por la Cámara de Representantes y la Superintendencia del Capitolio y el Senado de Puerto Rico. Asumiendo que esta sección perdura al cierre del año fiscal, debemos concluir que el Gobernador no tiene razón. Esta sección dispone en lo pertinente:

> Sección 2.   Cuando los intereses del servicio y necesidades apremiantes de las agencias lo requieran, así como para asegurar que al cierre de cada año fiscal las operaciones de las agencias terminen con un presupuesto balanceado, **se podrán realizar transferencias entre las asignaciones de un mismo organismo así como entre las asignaciones hechas en esta Resolución Conjunta.**   (Énfasis nuestro.)

La referida sección no es extraña al proceso presupuestario de años recientes. A esos efectos, la sección 2 de la R.C. de la C. Núm. 77, que proveyó para los gastos ordinarios de funcionamiento para el año fiscal 2001-2002, disponía lo siguiente:

> Sección 2.   Cuando los intereses del servicio lo requieran, el jefe del organismo **podrá autorizar la transferencia de cantidades entre las partidas de asignación del presupuesto de un mismo organismo del Gobierno del Estado Libre Asociado de Puerto Rico, y entre partidas de unidades adscritas a otros organismos o unidades relacionadas conforme a la estructura organizacional actual,** incluyendo las aportaciones que se proveen a las Empresas del Gobierno.[20]

---

[20] La R.C. de la C. Núm. 566, para proveer las asignaciones para los gastos ordinarios de funcionamiento para el año fiscal 2002-2003, tenía un lenguaje muy similar a la R.C. de

Así, la R.C. de la C. 77 autorizaba trasferencias entre las distintas partidas de asignación de una misma agencia, así como también entre las partidas de varias agencias que estuviesen operando bajo una misma "sombrilla"; las cuales  la Resolución Conjunta describe como "organismos o unidades relacionadas conforme a la estructura organizacional . . .", para enjugar un presupuesto deficitario. **Este mecanismo fue concebido para utilizarse al cierre del año fiscal**.

Ese texto se amplió en años subsiguientes con el propósito de conferirle mayor flexibilidad al Primer Ejecutivo en el manejo de los presupuestos **de las agencias de gobierno** de suerte que, al cierre del año económico aquella agencia que confrontaba problemas fiscales ("agencia deficitaria"), se le pudieran transferir fondos, no tan sólo **de las partidas asignadas a otras agencias dentro de la misma estructura organizacional, los llamados departamentos "sombrillas" y entre las partidas de la misma agencia deficitaria, sino que también, la R.C. de la C. 927 autorizó**

_____

la C. 927.  La Resolución aprobada para el año fiscal 2002-2003, disponía:

> Cuando los intereses del servicio lo requieran, así como para asegurar que **al cierre de cada año fiscal** las operaciones de las agencias terminen con un presupuesto balanceado, **se podrán realizar transferencias entre las asignaciones de un mismo organismo, así como entre las asignaciones hechas en esta Resolución conjunta.**  (Énfasis nuestro.)

Por el contrario, al año siguiente, la Resolución Conjunta 694 que proveyó para los gastos ordinarios del funcionamiento del Gobierno para el año fiscal 2003-2004, limitó el marco de acción del Gobernador al autorizar sólo las **"transferencias entre las asignaciones de un mismo organismo."**  (Énfasis nuestro.)

**que se pudieran transferir fondos a la agencia deficitaria de cualquier otra agencia de la Rama Ejecutiva o de otros fondos legislados.** Ello permitía como dice la propia Resolución Conjunta **"que al cierre del año fiscal las operaciones de las agencias terminen con un presupuesto balanceado. . . ."** Su propósito es por lo tanto hacer más maleable el manejo de los asuntos presupuestarios de las agencias de la Rama Ejecutiva permitiendo transferencias de fondos entre éstas.

Nada hay en el texto, en su historial, o la práctica presupuestal, que nos permita concluir que la Asamblea Legislativa pretendió con este lenguaje conferirle al Gobernador la facultad extraordinaria de transferir fondos de la Asamblea Legislativa para enjugar el déficit de una agencia del Ejecutivo o mas grave aun, para aumentar el presupuesto de una agencia reduciendo el de la Legislatura.

El hecho que la R.C. de la C. 927 contenga la asignación correspondiente a la Rama Legislativa no es suficiente para sostener la posición del gobierno. Adviértase, que para poder llevar a cabo las transferencias que se le autorizan al Primer Ejecutivo en esta sección de la Resolución Conjunta, se requiere, entre otras cosas, que éste tenga información sobre la situación fiscal de las distintas agencias para así poder determinar cuál necesita fondos y cuáles tienen sobrantes. Pero conforme vimos ya, la Asamblea Legislativa no viene obligada a informar a la OGP el estado de sus finanzas. ¿Cómo entonces se pueden hacer los recortes a la Cámara de Representante o al Senado? ¿Qué criterios se utilizarán para llevar a cabo esos recortes? ¿Qué certeza

tiene el Primer Ejecutivo que sus recortes no afectan áreas esenciales de las operaciones de la Cámara de Representantes o al Senado? **La teoría del gobierno entraña entonces que avalemos un curso de acción para el cual no hay parámetros algunos más allá del criterio del Gobernador. Ese camino no lo habremos de emprender.**

A base de lo anterior, no encontramos apoyo en el texto de la sección 2 de la R.C. de la C. 927 para avalar la posición del Gobernador. Concluimos en su consecuencia que la misma no aplica a la Rama Legislativa.

Conforme esta conclusión no es necesario una expresión como la hecha por el Tribunal de Primera Instancia, en el sentido que la sección 2 no continúa rigiendo durante el año económico 2005-2006 por ser ésta una regla de desembolso y no una partida de dinero a tenor con el Art. VI, Sec. 6 de la Constitución. Lo cierto es que, aún asumiendo, como lo hemos hecho, que ésta está vigente, su texto no nos permite concluir que la misma pretendió autorizar ajustes unilaterales al presupuesto de la Asamblea Legislativa.

Para resumir, el Gobernador no tiene facultad ni constitucional ni estatutaria para efectuar recortes unilateralmente al presupuesto de la Cámara de Representantes y la Superintendencia del Capitolio o el Senado de Puerto Rico. Su actuación en contrario es ineficaz por carecer de autoridad en ley. **La falta de consenso o voluntad política para afrontar los problemas fiscales del país no puede justificar construir un remedio inconstitucional.**

**C**

Finalmente, debe quedar meridianamente claro lo que no sostenemos. No se trata de que la Cámara de Representantes o el Senado estén exentos de asumir su responsabilidad constitucional en un momento histórico donde se plantean serios problemas fiscales para el país. Se trata de que a tenor con el sistema republicano de gobierno establecido en nuestra Constitución, cada rama tiene que asumir la responsabilidad del manejo de sus asuntos internos sin la intervención de otro de los poderes constitucionales.

La Asamblea Legislativa, una de las dos ramas políticas de nuestro gobierno, actuará de la forma y manera que los representantes y los senadores determinen. Las actuaciones de éstos, como las de todos los funcionarios electos, están sujetas a la evaluación del electorado cada cuatro años. Es en ese momento que se pasa juicio político sobre la sabiduría y la corrección de las determinaciones y actuaciones tomadas a lo largo de un cuatrienio. Así es el proceso democrático; quién siempre tiene la última palabra es el elector.

Debe quedar igualmente claro que el reajuste efectuado por el Gobernador en la partida correspondiente a la Cámara de Representantes, la Superintendencia del Capitolio y el Senado requiere para su validez, legislación expresa que así lo autorice. Legislación en la cual se establezcan criterios objetivos y neutrales que permitan efectuar los reajustes en el presupuesto de otra rama de gobierno. En ausencia de legislación sobre este particular la actuación del Gobernador se revela claramente improcedente. **Interpretar**

**expansivamente las disposiciones invocadas por el Gobernador en apoyo a su posición, para encontrar entre sus intersticios una autorización extraordinaria que no se contempló, es violatoria de los más fundamentales principios de la separación de poderes.**

Al cerrar debo señalar que no es función de este Tribunal determinar cómo debe quedar estructurado un presupuesto a través del cual se adelanta la obra de gobierno. Esa función es una eminentemente política que le corresponde a los funcionarios electos. Nuestra responsabilidad como custodios del texto de la Constitución, es velar por que las determinaciones que se tomen en ese proceso sean cónsonas con el propio texto y con los valores democráticos que encarna la Constitución.

Por las razones que anteceden somos del criterio que no procede el recorte en la partida correspondiente a la Cámara de Representantes, la Superintendencia del Capitolio y el Senado de Puerto Rico, efectuado por el Gobernador.

A tenor con lo antes expuesto, revocaría la sentencia dictada por el Tribunal de Primera Instancia en el caso Senado de Puerto Rico v. Acevedo Vilá y otros, KPE2005-3947 y confirmaría la sentencia dictada en el caso José Aponte Hernández v. Acevedo Vilá y otros, KPE2005-3411, en aquellos aspectos que fueran compatibles y consistentes con lo expresado en esta Opinión disidente.


                            Anabelle Rodríguez Rodríguez
                                  Juez Asociada