Voto explicativo emitido por la
Jueza Asociada Señora Fiol Matta.
Cuando el derecho se sustenta en la razón y en el orde-namiento jurídico, no hay nada más que decir. Nuestra opi-nión disidente emitida el 2 de febrero de 2010 es clara y no deja margen a dudas para concluir, como lo hice, que el Capítulo III de la Ley Núm. 7 de 9 de marzo de 2009, según emendada (Cap. III de la Ley Núm. 7 de 2009),(1) es incons-titucional desde su faz hasta su aplicación. Sin embargo, me veo en la obligación de aclarar algunas apreciaciones equivocadas sobre mi opinión disidente que se presentan en el Voto Particular que hoy emite el compañero Juez Aso-ciado Señor Rivera Pérez, al cual se han unido el compa-ñero Juez Asociado Señor Martínez Torres, la compañera Jueza Asociada Señora Pabón Charneco, y el compañero Juez Asociado Señor Kolthoff Caraballo.
*446 Mi conclusión respecto a que el Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional de su faz es fácilmente constatable. Basta con observar el texto de la medida. Es evidente que este capítulo contiene más de un asunto dis-tinto a la reducción de la nómina gubernamental que se anuncia en el título del estatuto. Además, aun conce-diendo, para efectos del análisis, que el Capítulo III atiende un solo asunto, el mismo no se anuncia claramente en el título de la ley. Esto, como discutí en mi opinión disi-dente, es una clara violación al Artículo III, Sección 17 de nuestra Constitución.(2)
Por otro lado, mi conclusión de que el Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional en su aplicación, por violentar el debido proceso de ley procesal constitucio-nal y la cláusula de menoscabo de las obligaciones contrac-tuales, tiene justificación jurídica en dos consideraciones.
Primero, los expedientes de los casos contenían las car-tas de cesantías que fueron notificadas a los empleados cesanteados. De éstas se podía claramente observar que la notificación era defectuosa porque no incluía la causa de la cesantía ni la prueba que tenía el patrono para validar los despidos. Por ejemplo, no se aludía a la antigüedad corres-pondiente al empleado cesanteado con relación a otros, no se describía el plan de cesantía y mucho menos se describía el método que se utilizó para implementarlo. Esta ausencia de información provocó que el trabajador no tuviera una oportunidad real de ser oído y mucho menos la opción de defenderse. La “vista previa” a la cesantía provista por el estatuto no subsana esto pues sólo permite cuestionar la determinación de antigüedad, imposibilitando así que el empleado pudiera impugnar su cesantía con relación a la de otros empleados cesanteados o cuestionar la misma por razón de otros asuntos. Ante este panorama, no se puede menos que concluir que la vista previa a la cesantía es un mecanismo puramente pro forma.
*447 Segundo, ante la alegación de que la Ley Núm. 7 de 2009 violenta la cláusula constitucional de menoscabo de las obligaciones contractuales, en términos del contrato de trabajo individual y colectivo, y la aceptación de la mayoría de que este menoscabo es severo, le corresponde al Estado el peso de la prueba para establecer la razonabilidad y la necesidad de la medida.(3) El Estado no pudo cumplir con estos requisitos porque no tuvo la oportunidad de presen-tar prueba. De los expedientes de los casos no surge prueba que sustente que el menoscabo de estos contratos, aunque severo, es razonable y necesario. Esto desde la óptica de que no existían métodos menos onerosos para reducir el gasto de la nómina gubernamental y atender la crisis fiscal del país. Ante esta realidad, requerir prueba de la incons-titucionalidad del estatuto es, como menos, innecesario.
A su vez, la ausencia de prueba sobre la razonabilidad y necesidad de la medida se debió a que no se siguió el pro-ceso judicial ordinario, es decir, no se aprovechó la oportu-nidad de presentar prueba y contar con la adjudicación ini-cial del Tribunal de Primera Instancia y la revisión del Tribunal de Apelaciones. En fin, los expedientes no esta-ban completos por la certificación apresurada de estos casos. Todas estas consideraciones no permiten sostener la determinación de constitucionalidad de la Ley Núm. 7 de 2009 a la cual llegó la mayoría de este Tribunal, máxime cuando se encontraba en juego el derecho constitucional que los empleados públicos tienen a su puesto, producto de la normativa laboral y de su contrato de trabajo individual y colectivo.
Al analizar si la Ley Núm. 7 de 2009 viola la cláusula de menoscabo de las obligaciones contractuales, uno de los as-pectos centrales, más allá de si existe la crisis fiscal, es examinar si el Estado utiliza la alegada crisis para validar el uso de medios onerosos, como el despido masivo de em- *448 pleados públicos y la suspensión de derechos contenidos en la legislación laboral y en los convenios colectivos. Para determinar si la medida es razonable y necesaria —como expuse en mi opinión disidente— el Tribunal Supremo federal ha señalado que no se le debe otorgar completa defe-rencia al análisis que realice la Legislatura sobre estos dos criterios. Esto porque existe un claro conflicto de interés.
No se trata de que el Tribunal Supremo federal reco-nozca y mucho menos que postule “como necesario conce-der alguna deferencia a la actuación estatal”(4) como equi-vocadamente expone el compañero Juez Asociado Señor Rivera Pérez. Esta apreciación no es del alto foro federal, sino que ha sido el resultado de la interpretación que le han dado algunos tribunales federales apelativos a la doc-trina sobre la deferencia que se debe otorgar a la actuación legislativa cuando se menoscaban contratos públicos. So-bre este punto, es necesario dejar claro, como señalé en mi opinión disidente, que es permisible referirse a jurispru-dencia federal apelativa para propósitos de persuasión. Lo que es impermisible es que se utilice esa jurisprudencia para resolver de manera contraria al mínimo que exige el Tribunal Supremo federal. En fin, este Tribunal burló la norma de no dar “completa deferencia” establecida por el Tribunal Supremo federal, cuando le otorgó total deferen-cia a la Exposición de Motivos de la Ley Núm. 7 de 2009, que es lo mismo que darle completa deferencia a las alega-ciones del Estado.
Aprovecho para reiterar mi criterio completamente con-trario al de los compañeros que suscribieron la Opinión del Tribunal en este caso, así como el Voto Particular al que nos hemos referido, en lo que respecta a la naturaleza del derecho propietario de los empleados públicos sobre sus puestos de trabajo. Aduce la Opinión, e insiste el Voto Particular, que no se trata de un derecho adquirido porque la *449 Ley Núm. 184 de 3 de agosto de 2004, según enmendada,(5) y sus predecesoras, incorporara un debido proceso de ley para cesantear trabajadores por motivo de falta de fondos o trabajo. Al contrario, esta consideración fortalece nuestra conclusión porque hace evidente que el derecho adquirido al puesto no es producto de una mera expectativa, sino que surge de todo el andamiaje que representa la administra-ción de personal público y, en específico, de un contrato de trabajo en el que se acuerdan la extensión y alcance del mismo.
Mi llamado a la mesura responde, precisamente, a que estos trabajadores tienen un derecho adquirido sobre sus puestos, protegido constitucionalmente, y por el daño que una determinación sin justificación jurídica ni prueba puede ocasionarle a éstos, a sus respectivas familias, a la economía y a la sociedad en general. Este reclamo de me-sura no es caprichoso y no hace daño a nadie.
Contrariamente, la determinación de este Tribunal le ha ocasionado daño a miles de seres humanos. Este re-clamo recoge, además, la directriz del Tribunal Supremo federal, en United States Trust Co. v. New Jersey, que im-pone la obligación de escoger un curso de acción más mo-derado (a more moderate course) cuando éste sea adecuado.(6) Un ejemplo de mesura y de las medidas menos onerosas a las que se refiere el Tribunal Supremo federal es la decisión tomada por el Departamento de Educación de restituir en sus puestos —el 11 de febrero de 2010— a 1,784 conserjes. Estos representan el cincuenta y un por ciento de los 3,489 conserjes a los cuales se les había dado cartas de cesantía y que ya no estaban trabajando(7) La *450 Autoridad Nominadora del Departamento de Educación optó por negociar con el sindicato métodos menos onerosos —como la reducción de cinco por ciento del salario y medio día de la jornada de trabajo— para atender el problema fiscal de la agencia. En otras palabras, se enfrentó la crisis fiscal sin recurrir a medidas extremas que violentaran los derechos constitucionales de los trabajadores y quebraran la estabilidad laboral, política y social de nuestro país.
Por último, el compañero Juez Asociado Señor Rivera Pérez plantea que en otras ocasiones este Tribunal ha to-mado conocimiento judicial de la crisis fiscal del país, sin prueba en el expediente y basando su determinación exclu-sivamente en el texto de la ley. Para sustentar su argu-mento alude a los casos Presidente de la Cámara v. Gobernador,(8) Díaz Saldaña v. Gobernador(9) y Romero Barceló v. E.L.A(10)- Cada uno de estos casos es claramente distin-guible de la controversia sobre las cesantías masivas de empleados públicos ocasionadas por la política pública que establece la Ley Núm. 7 de 2009.
La controversia del primer caso surgió cuando el Hon. Aníbal Acevedo Vilá, entonces Gobernador de Puerto Rico, redujo el presupuesto de la Rama Legislativa, lo que pro-vocó que el Hon. José Aponte Hernández, anterior Presi-dente de la Cámara de Representantes, presentara una de-manda alegando que la actuación del Gobernador era inconstitucional porque estaba en contra de la doctrina de separación de poderes. Por su parte, la controversia del segundo caso se originó cuando el licenciado Acevedo Vilá le emitió una instrucción al Hon. Juan Carlos Méndez Torres, Secretario de Hacienda, para que sólo se le autorizara al Hon. Manuel Díaz Saldaña, Contralor de Puerto Rico, el *451 desembolso del setenta y cinco por ciento de los gastos de nómina y otros gastos operacionales de la Oficina del Con-tralor para los meses de mayo y junio del 2006. Ante esta actuación, el contralor Díaz Saldaña sometió ante este Tribunal un recurso de mandamus.
El tercer caso surgió cuando el Hon. Carlos Romero Bar-celó y el Sr. Peter Muller Maldonado, en calidad de contri-buyentes afectados, presentaron una demanda sobre sen-tencia declaratoria para impugnar la alegada inter-pretación errónea que la Rama Ejecutiva había realizado del impuesto sobre las ventas y el uso que establecía la Ley de Justicia Contributiva de 2006. La Rama Ejecutiva in-terpretó que la tasa contributiva era de 5.5% para el Es-tado y de 1.5% para los municipios, para un impuesto total máximo sobre las ventas y el uso de un siete por ciento. Mientras, los demandantes planteaban que esta interpre-tación era equivocada y que procedía establecer una tasa contributiva de cuatro por ciento estatal y un 1.5% municipal.
Como puede observarse, cada uno de estos casos acon-tecieron en un contexto donde existía un conflicto entre dos ramas de poder, la legislativa y la ejecutiva. Además, los primeros dos casos no se resolvieron en sus méritos, no porque este Tribunal declinara ejercer su función judicial, como expone el compañero Juez Asociado Señor Rivera Pé-rez, sino más bien porque la ejerció para concluir, luego de un ponderado análisis jurídico, que no debíamos asumir jurisdicción. Específicamente, en el primer caso nos abstu-vimos de resolver la controversia por cuestiones de justi-ciabilidad, fundamentada en la doctrina constitucional de academicidad, porque el Gobernador había aprobado una orden ejecutiva para desembolsar las asignaciones presu-puestarias de la Rama Legislativa. Fue únicamente en este contexto que expresamos que “parece evidente que la con-dición fiscal del país no es la misma que existía cuando el *452 Gobernador decidió reducir los aludidos presupuestos”.(11) Mientras, en el segundo caso decidimos denegar la expedi-ción del mandamus, que es un recurso de carácter discre-cional, porque la controversia había sido resuelta entre la Rama Ejecutiva y Legislativa. En ese contexto expresa-mos:
... tomamos conocimiento judicial de que al ser aprobada la Ley para el Financiamiento del Déficit Gubernamental del 2006 supra, y la Resolución Conjunta Núm. 119 de 13 de mayo de entre otras piezas legislativas, cesaron aquellas razones aducidas por el Gobernador en su Orden Ejecutiva para orde-nar el desembolso limitado de los gastos de la Oficina del Contralor.(12)
En cuanto al tercer caso, que sí se resolvió en sus méri-tos, nunca hicimos expresión alguna sobre la crisis fiscal del país, ni mucho menos sustentamos nuestra determina-ción en ésta. Lo más cercano a eso fue lo siguiente:
Es de conocimiento público que la Rama Ejecutiva ha tomado las medidas necesarias para la imposición de un impuesto es-tatal a una tasa contributiva de un 5.5%, la cual a partir del 15 de noviembre de 2006 se unirá a una tasa contributiva de 1.5% correspondiente al impuesto municipal. La reglamenta-ción necesaria por parte del Departamento de Hacienda ya ha sido aprobada. Sólo resta la llegada de la fecha de vigencia de la Ley de la Justicia Contributiva de 2006, a saber, el 15 de noviembre de 2006, para que ésta entre en vigor, según ha sido interpretada por la Rama Ejecutiva. Tanto la aprobación como la vigencia de la mencionada pieza legislativa es defini-tiva y su inminente aplicación reviste de concreción y de ma-durez a la reclamación presentada por los demandantes y peticionarios. (Énfasis suprimido.)(13)
Estas expresiones fueron producto del análisis jurídico que realizamos para determinar si la controversia estaba madura para ser resuelta. Luego de esta ponderación, con- *453 cluimos que la controversia estaba madura y procedimos a interpretar la Ley de la Justicia Contributiva de 2006. Como puede observarse, tanto este caso como los primeros dos planteaban cuestiones exclusivamente de derecho, por lo cual era innecesario, contrario a lo que afirma el compa-ñero Juez Asociado Señor Rivera Pérez, que se presentase prueba y que este Tribunal se basara en ésta para adjudi-car la controversia. De todas formas, los juicios sobre ac-tuaciones del pasado no pueden ser el fundamento para decisiones tomadas en el presente.
Ninguna de estas previas decisiones afectó derechos constitucionales de los ciudadanos, ni mucho menos dejó sin sustento a miles de trabajadores puertorriqueños, con sus respectivas familias. Esto es distinto a la actuación de la mayoría de este Tribunal en este caso, que tomó conoci-miento de la alegada crisis fiscal del país de $3,200 millo-nes y de que la única opción viable para atenderla era la cesantía masiva de empleados públicos, sin prueba en el expediente y basándose exclusivamente en la Exposición de Motivos de la Ley Núm. 7 de 2009, es decir, en las ale-gaciones del Estado.
Nuestro pueblo merece un Tribunal que respete profun-damente las leyes y tradiciones que fundamentan nuestra cultura de trabajo. No necesita un Tribunal que adjudica una controversia con un expediente huérfano de prueba, sólo a base de las alegaciones, cuando están en juego los derechos constitucionales de miles de ciudadanos.

 Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.

 Art. Ill, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008.

 Véanse: United States Trust Co. V. New Jersey, 431 U.S. 1 (1977); Bayrón Toro v. Serra, 119 D.P.R. 605 (1987).

 Voto particular del Juez Asociado Señor Rivera Pérez, pág. 419.

 Este estatuto se conoce como Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico.

 United States Trust Co. v. New Jersey, supra, pág. 31. Claro, que para deter-minar que no procede la acción más moderada y que el curso de acción debe ser más drástico es necesario recibir prueba del Estado.

 X. Neggers Crescioni, Education, SPT Agree to Save 1,784 Jobs, 4005 Workers to be Fired, Puerto Rico Daily Sun, 11 de febrero de 2010; S. Caquías Cruz, *450 Retienen sus empleos 1,784 conserjes escolares: trabajarán media hora menos y sus salarios se reducirán en un 5%, El Nuevo Día, 11 de febrero de 2010.

 Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006).

 Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006).

 Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006).

 Presidente de la Cámara v. Gobernador, supra, pág. 159.

 Díaz Saldana v. Acevedo Vilá, supra, pág. 368.

 Romero Barceló v. E.L.A., supra, pág. 476.